DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

MICHELLE J. KANE (CABN 210579)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    michelle.kane3@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **CASE NO. CR 15-00106 EJD** |
| | ) |
| Plaintiff, | ) **UNITED STATES' TRIAL MEMORANDUM** |
| | ) |
| v. | ) Date: September 10, 2019 |
| | ) Time: 10:00 a.m. |
| HAO ZHANG, | ) Courtroom No. 4 |
| | ) |
| Defendant. | ) |
| | ) |

In anticipation of the continuation of the bench trial of this matter on September 10, 2019, the United States respectfully submits this memorandum to provide an overview of the evidence and witnesses, and to highlight potential disputed issues.

## I.    SUMMARY OF CHARGES

Defendant Hao Zhang is charged in a Superseding Indictment with Economic Espionage and Theft of Trade Secrets, and conspiracy to commit both offenses. The Superseding Indictment charges Zhang along with his co-conspirators, a group including individuals affiliated with Tianjin University ("TJU") in the People's Republic of China ("PRC") and others, with conspiring to steal trade secrets from two companies in the United States and to use those trade secrets for the benefit of entities and instrumentalities of the Chinese government. Co-conspirator Wei Pang, who attended graduate school at

the University of Southern California ("U.S.C.") with Zhang, is a former employee of Avago Technologies, while defendant Zhang is a former employee of Skyworks Solutions, Inc. Pang and Zhang stole radio frequency ("RF") filter technology from their employers and delivered it to the PRC. Both received tenured professorships at TJU, where they now oversee a fabrication plant that is virtually identical to Avago's production line in Fort Collins, Colorado. Their business is part of a joint venture with a wholly-owned subsidiary of TJU, a Chinese National Key University, subordinate to the Chinese Ministry of Education.

Huisui Zhang helped Pang and defendant Zhang, almost from the beginning, with their business plan. Jinping Chen is a TJU official who worked directly with Pang and Zhang to bring the stolen technology to the PRC, while Zhao Gang became the general manager of ROFS Microsystems, a joint venture established between TJU's commercial arm, Micro-Nano Manufacturing Tech Company ("MNMT"), and a company formed by Pang, Zhang, and others. Finally, Chong Zhou was a graduate student at TJU who worked with the stolen trade secrets.

The grand jury returned the Superseding Indictment on April 1, 2016, alleging 32 counts against the six defendants. Count One alleges a conspiracy between all six defendants to commit economic espionage, in violation of 18 U.S.C. § 1831(a)(5). Superseding Indictment ("S.I.") ¶¶ 22-30. The Superseding Indictment lists 79 overt acts committed in furtherance of the conspiracy. S.I. ¶ 30. Count Two alleges a conspiracy between all six defendants to commit theft of trade secrets, in violation of 18 U.S.C. § 1832(a)(5). S.I. ¶¶ 31-34. It alleges the same 79 overt acts. S.I. ¶ 34. The key distinction between economic espionage and theft of trade secrets is that economic espionage must be done with the knowledge or intent that the offense benefit a foreign government, instrumentality, or agent. 18 U.S.C. § 1831(a). Both offenses rely on the same definition of "trade secret," contained in 18 U.S.C. § 1839(3).

Counts Three through Seventeen allege economic espionage, in violation of 18 U.S.C. §§ 1831(a)(1), (2), (3), and 2. S.I. ¶¶ 35-36. Counts Eighteen through Thirty-Two allege theft of trade secrets, in violation of 18 U.S.C. §§ 1832(a)(1), (2), (3), and 2. S.I. ¶¶ 37-38. The economic espionage and theft of trade secrets counts charge the same offense conduct. Thus, for example, Counts Three and Eighteen both allege that, on March 16, 2010, defendant Zhang filed a U.S. patent application using a misappropriated Avago trade secret. S.I. ¶¶ 36, 38. Defendant Zhang is not charged in Counts 17 and 32.

On June 19, 2019, the parties waived their rights to a jury trial and entered an agreement to conduct a non-jury court trial. ECF Nos. 291, 293. The parties began the trial that day, admitting an Evidentiary Stipulation of Facts for Trial ("E.S.") as Exhibit One and excerpts of WeChat communications as Exhibit Two. ECF Nos. 292-1 and 292-2.

## II.   SUMMARY OF EVIDENCE AND METHODS OF PROOF

### A.   Evidence Already Admitted

#### 1.   Background Regarding Technology and Trade Secrets

The Evidentiary Stipulation describes the technology at issue, including:

- Surface Acoustic Wave ("SAW") and Bulk Acoustic Wave ("BAW") filters are used in wireless devices to eliminate interference and improve other aspects of device performance. E.S. ¶ 3.

- Film Bulk Acoustic Resonators ("FBAR") are one type of BAW filter. They filter incoming and outgoing wireless signals for wireless devices. E.S. ¶¶ 3-4

- The most common and most profitable application of FBAR technology is as an RF filter for mobile phones and other wireless devices. Technological advances in FBARs have played a substantial role in creating smaller, more efficient wireless devices for both consumer and military applications. E.S. ¶ 5.

The Evidentiary Stipulation also describes some of the relevant parties and entities:

- Avago Technologies ("Avago") was headquartered in San Jose, California, and Singapore, and had facilities around the United States and the world. The facilities operated by Avago included a fabrication plant in Fort Collins, Colorado. Avago was the leading company in the United States manufacturing and selling FBARs. E.S. ¶¶ 1, 4.

- Skyworks Solutions, Inc. ("Skyworks") was an innovator of high performance analog semiconductors. Skyworks was headquartered in Woburn, Massachusetts, and had facilities around the United States and the world. E.S. ¶ 2.

- Tianjin University ("TJU") includes the College of Precision Instrument and Opto-Electronic Engineering ("College of Precision Instrument"). Hao Zhang was a TJU Professor in the College of Precision Instrument, as was Wei Pang and Jingping Chen. E.S. ¶ 6.

- Novana, Inc. ("Novana"), was a shell corporation formed in the Cayman Islands by Wei Pang, Hao Zhang, and others in 2009.

The Evidentiary Stipulation describes Avago's and Skyworks' confidential and proprietary information included or intended to be included in products sold worldwide. It also establishes that both companies derived a competitive advantage in the marketplace by keeping this information confidential. The specific types of proprietary information at issue here are listed and described, including design elements, packaging techniques, and manufacturing processes. E.S. ¶¶ 8, 10. The Evidentiary Stipulation also contains a description of the extensive measures, consistent with industry standards, taken by both Avago and Skyworks to protect their proprietary information. E.S. ¶¶ 9, 11.

### 2.    Offense Conduct

Beginning in 2006 and ending no later than February 18, 2015, the defendants began a project to start a new company that would manufacture FBARs in China. E.S. ¶ 12. On October 29, 2006, Huisui Zhang emailed Wei Pang and Hao Zhang his notes from a planning meeting for creating an FBAR fabrication facility in the PRC. One subsection of the notes was entitled: "Cost saving by moving Avago to China." E.S. ¶ 15a. While still employed at Avago and Skyworks, Pang and Zhang communicated with each other and with others regarding their plan.

Beginning in at least July 2007, Pang solicited entities in the PRC regarding the proposed company. E.S. ¶ 15m. In 2008, Pang, Zhang, and others met with TJU officials in San Jose, California. E.S. ¶ 15t. By mid-September 2008, the plan to work with TJU had come together. E.S. ¶ 15u. Between October 12 and October 26, 2008, Pang and Zhang coordinated with TJU officials to apply for PRC government funding to build a MEMS research lab, including applications to the Tianjin Science and Technology Development Zone; the State Key Laboratory (National Laboratory) & Introduction of Overseas High Level Talent program; the 985 Project; the 211 Project; and the MEMS Engineering Research Center of Ministry of Education. E.S. ¶ 15w.

Throughout the time of the conspiracy, Pang and Zhang transmitted documents containing Avago and Skyworks proprietary and confidential information to each other and to other co-conspirators. E.g., E.S. ¶¶ 15v, x, z, bb, vv, and qqq.

Wei Pang and Hao Zhang applied for patents in both the United States and China. Filing for

patents enabled them to present themselves to potential investors and suppliers as the developers and owners of the intellectual property. E.S. ¶ 14. The patents that Zhang filed with only his name included misappropriated Avago confidential information, such as Air Bridge, Wings, Temperature Compensation, Coupled Resonator Filters, and Silicon Carbide technology. E.S. ¶ 15qq, ww, xx, yy, zz.

In June 2009, Zhang left Skyworks and Pang left Avago. Both relocated to the PRC, where they began full-time employment as professors at TJU. E.S. ¶¶ 15mm, nn. Before he left Skyworks, Zhang informed a TJU official that he had been transferred to another department and planned to use his remaining time at the company to become familiar with additional technology. This would "greatly benefit [his] future endeavor at Tianjin University." E.S. ¶ 15f.

On April 5, 2009, Wei Pang emailed several individuals named in the indictment informing them that he had communicated with TJU officials and that the plan was to set up a company in the Cayman Islands and then form a joint venture in Tianjin with MNMT, which was "a Tianjin University 100% controlled company." E.S. ¶ 15jj. On September 10, 2009, Wei Pang registered Novana in the Cayman Islands. E.S. ¶ 15pp. Pang, two unindicted individuals, and Hao Zhang each contributed seed money to Novana. E.S. ¶¶ 7, 13. On September 22, 2011, Jingping Chen emailed officials at TEDA to verify the agreement between Tianjin Economic and Technological Development Area ("TEDA") and the ROFS MEMS project. The agreement clarified that Wei Pang, Hao Zhang, Jingping Chen, Zhao Gang, and others held positions at ROFS.

Avago became aware of the potential theft of its trade secrets after it saw defendant Zhang's United States patent applications covering Avago trade secrets in the fall of 2011. Later in 2011, Pang's former boss at Avago, Dr. Rich Ruby, traveled to the PRC to attend a conference. While he was in the PRC, Dr. Ruby visited TJU to see Pang and Zhang's new MEMS ("Micro-electro-mechanical Systems") lab. Dr. Ruby toured the facility and formed the opinion that it was using stolen Avago technology. E.S. ¶ 15rrr.

Exhibit Two contains excerpts of chat communications from defendant Zhang's mobile phone that demonstrate how Zhang and others continued to discuss government and military resonator sales up to the day of his arrest. For example, on April 14, 2015, Zhang and Pang discussed the potential for additional clients of military products. Zhang noted that "Institute 13 is our only client of military

products." Exhibit 2 ¶ 1(a). In another example, on February 22, 2015, Zhang asked ROFS employee Yun Zhuo Xin Zheng how they could do better in designing both civilian and military products. Exhibit 2 ¶ 1(d).

**B.     Anticipated Evidence**

The evidence already admitted is sufficient to support a guilty verdict on each count in which defendant Zhang is charged. The government intends to introduce additional evidence to provide the Court further support for the verdict, focusing on two elements: defendant's knowledge or intent, and the benefits to a foreign government, instrumentality, or agent.

**1.     Defendant's Admissions**

FBI Special Agent Letitia Wu will testify regarding the genesis of the investigation following Avago's 2012 complaint to the FBI. She will explain that the FBI used search warrants to obtain much of the email evidence regarding the offenses, including Zhang's personal email account. Special Agent Wu will also testify that defendant Zhang agreed to an interview following his 2015 arrest in Los Angeles. The Court is familiar with this interview, having reviewed the recording in ruling on defendant's motion to suppress. The United States will introduce several of defendant's admissions during that interview, including:

- Defendant sent a Skyworks PowerPoint presentation marked "Confidential and Proprietary" to Pang while Pang was at Avago;

- Defendant sent an Avago document marked "Restricted" back to Pang after Pang had given it to him and while Pang was in China;

- Defendant sent Pang Skyworks confidential specifications for aluminum nitride deposition;

- Defendant did not have authority from Skyworks and Skyworks did not want this information sent outside the company;

- Defendant sent "Confidential and Proprietary" Skyworks information to co-defendant Chong Zhou, who was working as a grad student under Pang and Zhang at TJU;

- Wei Pang's name was not on the U.S. patents using Avago technology because they were closely related to Avago's;

- The goal was to take Avago's process to China, without authorization.

1   Special Agent Wu will also testify regarding the search of defendant Zhang's mobile phone and

2   the communications discussing the ongoing ROFS business that the FBI found. In particular, she will

3   testify regarding the "WeChat" communications that demonstrate the co-conspirators' efforts with

4   regard to government and military sales in China.

5                               **2.     Expert Testimony of Dr. James Mulvenon**

6          Dr. James Mulvenon will testify regarding the structure of the PRC government and how it

7   relates to TJU, MNMT, and ROFS. Dr. Mulvenon is the Senior Vice-President of SOS International's

8   Special Programs Division where he leads a team of linguists, including Chinese speakers, performing

9   open-source research. He is a Chinese linguist by training and a specialist on the Chinese military. He

10  has spent over twenty years studying Chinese espionage, military, and cyber issues, and is regularly

11  consulted as a subject matter expert by the U.S. Intelligence Community, Department of Defense,

12  federal law enforcement, and Fortune 100 companies. He is a co-author of "Chinese Industrial

13  Espionage" (Routledge, 2013), an account of the complete range of China's efforts to illicitly acquire

14  foreign advanced technology, intellectual property, and trade secrets. Dr. Mulvenon has previously

15  testified as an expert in a similar capacity.

16         Dr. Mulvenon will testify regarding the Chinese "National Key Universities," of which TJU is

17  one, and their relation to the Ministry of Education. He will discuss how the government funds

18  university research and other projects, and controls the activities of TJU. Dr. Mulvenon will testify

19  regarding the components of TJU, including the College of Precision Instrument and Opto-Electronics

20  Engineering. He will also testify regarding TJU's wholly-owned company, MNMT, and its joint venture

21  with Novana, ROFS. Dr. Mulvenon will opine, based on his specialized knowledge, that TJU, MNMT,

22  and ROFS are all entities and instrumentalities of the Chinese government.

23  **III.   EVIDENTIARY ISSUES**

24         Defendant Zhang has disclosed the potential expert testimony of Dr. Eun Sok Kim, a Professor

25  of Electrical and Computer Engineering at the U.S.C. School of Engineering. The disclosure indicates

26  that Dr. Kim will testify in three primary areas: as an expert on MEMS/FBAR technology, as a lay

27  witness regarding defendant's character for honesty, and as an "expert" on the practices at the U.S.C.

28  MEMS research lab and at other university labs.

The United States objects to the proposed "expert" testimony regarding the information sharing practices at university labs. Such testimony does not tend to prove or disprove any fact of consequence to the Court's determination and is therefore inadmissible under Fed. R. Evid. 702(a). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (citations omitted). Defendant's disclosure indicates that Dr. Kim will testify regarding the "policies regarding the open exchange of information" at the U.S.C. lab and other university labs "during Prof. Zhang's time at the university." Such policies or practices are irrelevant to the trial of this case because defendant Zhang is accused of misappropriating trade secrets from two companies, his employer Skyworks and Pang's employer Avago. The allegations of the Superseding Indictment do not include any misappropriation of trade secrets while defendant Zhang was a student at U.S.C. The efforts by Skyworks and Avago to protect their confidential information are directly relevant to establishing that the information was trade secrets, but no discussion of information sharing policies or practices at the U.S.C. lab could be helpful to the Court's determination. The Court should exclude the testimony as impermissible expert opinion pursuant to Fed. R. Evid. 702(a).

Moreover, even if the Court were to find the proposed testimony relevant, it is not clear that Dr. Kim is qualified to testify as an expert on information sharing policies. He is undoubtedly experienced in electrical engineering. His biography demonstrates that he is an expert in specific MEMS-related topics. But he does not appear to have any academic training or experience studying "policies regarding the open exchange of information." The expert disclosure does not include any discussion of the principles and methods he employed here. As noted in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), the Court's basic gatekeeping obligation as described in *Daubert* applies to all expert testimony. Dr. Kim's proposed testimony does not demonstrate that it meets the standard for reliability described in *Daubert* and mandated by Fed. R. Evid. 702(c) and (d).

In addition, at least some of Dr. Kim's proposed "expert" testimony is based on his direct experience. For example, the disclosure states that he "will testify that he has visited numerous MEMS research laboratories at universities around the world, and in his personal experience those laboratories have similar policies . . . as did the USC MEMS lab." To the extent that he will testify on direct personal experience in an area outside his expertise, he is a lay witness subject to Rule 701. A similar standard of

1   helpfulness is required for the admissibility of lay opinion testimony – it must be "helpful to . . .

2   determining a fact in issue." Fed. R. Evid. 701(b). For the same reasons as stated above, the proposed

3   testimony fails to meet that standard.

4       Finally, it appears that the proposed testimony regarding defendant Zhang's experience at the

5   U.S.C. lab is an attempt to improperly introduce expert opinion testimony as to defendant Zhang's

6   mental state regarding the crimes charged – that is, whether he had the knowledge or intent required by

7   the statutes. Rule 704(b) prohibits such testimony. It is for this Court alone as the trier of fact to decide.

8   **IV.   APPLICABLE LEGAL STANDARDS**

9       The parties are preparing a joint submission regarding the applicable legal standards for the

10  Court's determination.

11  **V.   PROTECTING CONFIDENTIALITY OF TRADE SECRETS**

12      A public trial has the danger of revealing the very proprietary information that the government

13  alleges was misappropriated by defendants. Accordingly, care needs to be taken to protect Avago and

14  Skyworks confidential information. The parties entered a Stipulated Interim Protective Order to protect

15  confidential information during discovery. ECF Nos. 46, 172.

16      As noted at the June 19, 2019, trial session, the trade secrets are described in the evidentiary

17  stipulation in ways that do not reveal the underlying confidential information. Given the planned

18  structure of the bench trial, the United States does not anticipate that any testimony will reveal further

19  detail and thereby expose confidential information. If necessary, the United States will request that

20  witnesses be admonished not to reveal detailed information in answers to questions and, instead, to refer

21  to portions or lines of documents, or otherwise respond generally to questions. The government

22  anticipates that this will permit adequate examination and cross-examination. If any documents are

23  introduced at trial that contain confidential material, the United States will recommend to the Court that

24  the screens that typically are used to display documents to the gallery be switched off for the

25  //

26

27

28

U.S. TRIAL MEMORANDUM                     9
CR 15-00106 EJD

1   presentation of those documents. After the trial is completed, the United States will review the exhibits

2   that were admitted in evidence to determine whether any should be maintained under seal.

3   DATED: September 3, 2019                                    Respectfully submitted,

4                                                              DAVID L. ANDERSON
                                                               United States Attorney
5

6                                                              _/s/_____
7                                                              MICHELLE J. KANE
                                                               Assistant United States Attorney
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28