```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4
      UNITED STATES OF AMERICA,      )  CR-15-00106-EJD
 5                                   )
                        PLAINTIFF,   )  SAN JOSE, CALIFORNIA
 6                                   )
                  VS.                )  DECEMBER 16, 2019
 7                                   )
                                     )  PAGES 1-70
 8    PANG, ET AL,                   )
                                     )
 9                      DEFENDANT    )
                                     )
10    _____

11                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE EDWARD J. DAVILA
12                UNITED STATES DISTRICT JUDGE

13                    A P P E A R A N C E S

14

15     FOR THE PLAINTIFF:     BY:  MICHELLE J. KANE
                              U.S. ATTORNEY'S OFFICE
16                            1301 CLAY STREET
                              SUITE 340S
17                            OAKLAND, CA 94612

18     FOR THE DEFENDANT:     BY:  AUGUST P. GUGELMANN
                                   EDWARD SWANSON
19                            SWANSON & MCNAMARA LLP
                              300 MONTGOMERY STREET
20                            SUITE 1100
                              SAN FRANCISCO, CA 94104

21

22            APPEARANCES CONTINUED ON NEXT PAGE

23    OFFICIAL COURT REPORTER:     SUMMER FISHER, CSR, CRR
                                   CERTIFICATE NUMBER 13185
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
```

1    <u>APPEARANCES CONTINUED:</u>

2

3        FOR THE PLAINTIFF:     **BY:  SUSAN FRANCES KNIGHT**
                                U.S. ATTORNEY'S OFFICE
4                               150 ALMADEN BLVD., SUITE 900
                                SAN JOSE, CA 95113
5

6        FOR THE DEFENDANT:     **BY:  DANIEL BENJAMIN OLMOS**
         ZHANG                  NOLAN BARTON & OLMOS LLP
7                               600 UNIVERSITY AVE
                                PALO ALTO, CA 94301
8

9        ALSO PRESENT:          INTERPRETERS:
                                CONNIE CHEN & ANTHONY TAM
10
                                FBI SPECIAL AGENTS:
11                              LETITIA WU
                                JONATHAN KINGSLEY
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1            SAN JOSE, CALIFORNIA              DECEMBER 16, 2019
2                       P R O C E E D I N G S
3         (COURT CONVENED AT 10:13 A.M.)
4              THE COURT:  GOOD MORNING.  THANK YOU FOR YOUR
5     PATIENCE.
6              LET'S GO ON THE RECORD IN 15-106.  UNITED STATES V. HAO
7     ZHANG.
8              IF I COULD HAVE APPEARANCES OF THE PARTIES, PLEASE.
9              MS. KANE:  GOOD MORNING, YOUR HONOR.
10        MICHELLE KANE AND SUSAN KNIGHT FOR THE UNITED STATES.  AND
11    WITH US ARE FBI AGENTS LETITIA WU AND JOHN KINGSLEY.
12             THE COURT:  THANK YOU.  GOOD MORNING.
13             MR. GUGELMANN:  GOOD MORNING, YOUR HONOR.
14        AUGUST GUGELMANN, ED SWANSON AND DANIEL OLMOS FOR
15    MR. ZHANG WHO IS PRESENT, ASSISTED BY THE MANDARIN SPEAKING
16    INTERPRETER.
17             THE COURT:  THANK YOU.  GOOD MORNING, EVERYONE.
18        THIS IS THE DATE AND TIME THE WE SET FOR CLOSING ARGUMENTS
19     IN THIS BENCH TRIAL.
20        AND LET ME TELL YOU, FIRST OF ALL, WE HAVE THE TWO
21    INTERPRETERS HERE.  PLEASE, IF AT ANY TIME DURING THE
22    PROCEEDINGS, MR. ZHANG WISHES TO SPEAK PRIVATELY WITH HIS
23    LAWYERS AND WANTS A BREAK TO ACCOMPLISH THAT, I WILL ASK THE
24    INTERPRETERS TO PLEASE LET ME KNOW AND WE WILL CERTAINLY DO
25    THAT FOR YOU.
```

1       ALSO, SHOULD THE INTERPRETERS WISH TIME TO TAKE A BREAK

2    FOR TRANSITION, PLEASE LET ME KNOW, AND I WILL OF COURSE

3    ACCOMMODATE THOSE REQUESTS.  THANK YOU.

4       WHAT I THOUGHT WE WOULD DO TODAY IS I WANT TO GO OVER THE

5    DOCUMENTS I'VE RECEIVED, AND I'M EAGER TO HEAR YOUR ARGUMENTS

6    TODAY, AND THEN MY THOUGHT WAS I MAY HAVE US COME BACK IN

7    JANUARY FOR THE COURT'S DECISION, IF THE COURT DOESN'T

8    INDICATE, IN WRITING, A DECISION BEFORE THEN.  I JUST WANT TO

9    SET A PLACEHOLDER DATE FOR THAT PURPOSE, IF THAT MEETS WITH

10    YOUR APPROVAL.

11       AND I THINK WE'VE IDENTIFIED SOME DATES IN JANUARY,

12    MS. KRATZMANN?

13       THE CLERK:  IF THE PARTIES ARE AVAILABLE JANUARY 7TH

14    AT 10:00 A.M.

15       MR. SWANSON:  I'M NOT AVAILABLE THAT WEEK,

16    YOUR HONOR.

17       THE COURT:  ALL RIGHT.  WELL, LET'S GET THE NEXT

18    AVAILABLE FOR MR. SWANSON.

19       THE CLERK:  HOW ABOUT MONDAY, FEBRUARY 3RD AT

20    10:00 A.M.?

21       MS. KANE:  YES, YOUR HONOR.  THAT IS SUITABLE FOR THE

22    GOVERNMENT.

23       THE COURT:  WHY DON'T WE LET YOU MEET AND CONFER WITH

24    YOUR SCHEDULES FOR A MOMENT, LOOKING AT THE DEFENSE COUNSEL.

25       THE CLERK:  FEBRUARY 10TH IN THE MORNING IS NOT

1        AVAILABLE, COUNSEL.

2                THE COURT:  IS THERE A DAY THAT WEEK THAT WE COULD

3        SET AS A SPECIAL SET?  I'M SORRY, MS. KRATZMANN, DID YOU SAY

4        FEBRUARY 6TH IN THE AFTERNOON?

5                THE CLERK:  YES.  COUNSEL, TO ASSIST YOU, MAYBE

6        FEBRUARY 6TH IN THE AFTERNOON AT 2:00 P.M. IS AN ALTERNATIVE

7        DATE, OR IS THAT WEEK NOT GOOD?

8                MR. GUGELMANN:  SO IT LOOKS LIKE THE PARTIES COULD

9        ALL DO THE 24TH, IF THE COURT WANTED TO PUT IT OUT THAT FAR ON

10       THE CALENDAR.

11               THE CLERK:  YOU ARE UNAVAILABLE, JUDGE.

12               THE COURT:  THAT DOESN'T WORK FOR US, REGRETTABLY.

13               THE CLERK:  FEBRUARY 27TH, THURSDAY, AT 2:00 P.M.?

14               MR. GUGELMANN:  THAT WORKS FOR OUR SIDE.

15               MS. KANE:  YES, YOUR HONOR.

16               THE COURT:  GREAT.  ALL RIGHT.  LET'S DO THAT THEN.

17       THANK YOU VERY MUCH.

18           I APOLOGIZE FOR THE DELAY, BUT IT SEEMS LIKE THAT WILL

19       WORK FOR ALL OF US.

20           SO WHAT I WANTED TO DO TODAY, AS I SAID, I'M EAGER TO HEAR

21       FROM YOU REGARDING YOUR CLOSING ARGUMENTS IN THIS CASE.

22           I DO WANT TO INDICATE THAT I HAVE REVIEWED THE EVIDENCE

23       THAT WAS SUPPLIED TO ME IN YOUR BINDER, AND THIS WOULD INCLUDE

24       DOCUMENTS 304, 307, 314, 318, YOUR SUBMITTED CLOSING ARGUMENT

25       BRIEFS WHICH ARE DOCKETS 320, 322, AND THE REBUTTAL BRIEF, 323.

1          AND THE COURT HAS ALSO CONSIDERED THE TESTIMONY OF THE

2     HEARING THAT WE HELD ON OCTOBER 2ND, 2019, ALL THE STIPULATIONS

3     OF THE PARTIES, AS WELL AS THE REFERENCED MODEL NINTH CIRCUIT

4     CRIMINAL JURY INSTRUCTIONS THAT APPLY TO THIS CASE, AND YOU

5     HAVE SUPPLIED THOSE AS WELL.

6          IN PARTICULAR, THE COURT HAS NOTED AND CONSIDERED 8.14(A),

7     8.14(B), 8.41(C) -- DID I SAY 41?  YES, 41 (A), (B), AND (C),

8     THOSE WERE HELPFUL TO THE COURT, AS WELL AS THE OTHER MODEL

9     NINTH CIRCUIT JURY INSTRUCTIONS.

10         SO WHAT I WOULD LIKE TO DO IS TO PROCEED, ALLOW YOU TO

11    MAKE YOUR CLOSING ARGUMENTS.  I MAY HAVE SOME QUESTIONS AT THE

12    END.  I THINK IT'S -- HOW CAN I SAY THIS, AS A PRACTITIONER, IT

13    WAS REALLY, REALLY DIFFICULT WHEN A RESPECTED COURT WOULD

14    INTERRUPT A CLOSING ARGUMENT.  AND I CONTINUE WITH THAT

15    RECOGNITION, SO I'M NOT EAGER TO INTERRUPT YOUR PRESENTATIONS.

16    HOWEVER, I EXPECT YOU'RE EAGER TO HEAR, WELL, TELL US WHAT

17    YOU'RE INTERESTED IN, JUDGE, SO WE CAN SPEAK TO THAT.

18         MR. GUGELMANN:  WELL, WE HAD SORT OF ENVISIONED THIS

19    MORE OF TRADITIONAL ARGUMENT WITH THE COURT BACK AND FORTH.  TO

20    THE EXTENT THE COURT HAS QUESTIONS --

21         THE COURT:  DISCUSSION, OF COURSE.

22         MR. GUGELMANN:  DISCUSSION.  GIVEN SORT OF THE

23    CLOSING ARGUMENTS WERE SET OUT IN WRITING, I THINK BY BOTH

24    PARTIES.  SO AT LEAST ON -- SPEAKING FOR THE DEFENSE, WE WOULD

25    BE GLAD FOR THE COURT TO INTERRUPT IF THE COURT HAS QUESTIONS

1          AT ANY POINT.

2                    THE COURT:  OKAY.

3                    MS. KANE:  YES.  AND SAME GOES FOR THE GOVERNMENT, OF

4          COURSE, YOUR HONOR.

5                    THE COURT:  OKAY.  WELL, THANK YOU FOR GIVING ME

6          PERMISSION TO DO THAT.

7               ALL RIGHT.  AND I THINK -- DID YOU HAVE A SUGGESTION ABOUT

8          WHO WANTED TO GO FIRST?

9                    MS. KANE:  WE DID, YOUR HONOR.  THE DEFENSE AND THE

10         GOVERNMENT HAD DISCUSSED IT, AND GIVEN THE EXTENSIVE BRIEFING

11         THAT'S ALREADY GONE ON, SORT OF GOVERNMENT CLOSING, DEFENSE

12         CLOSING, GOVERNMENT REBUTTAL, IT SEEMED TO MAKE SENSE TO HAVE

13         THE DEFENSE NOW PROCEED, RATHER THAN DOING THE TRADITIONAL, YOU

14         KNOW, FIRST TO REPEAT, ESSENTIALLY, THE SAME ARGUMENTS THAT WE

15         MADE DIDN'T SEEM TO BE A GOOD USE OF ANYONE'S TIME.

16                   THE COURT:  OKAY.

17                   MS. KANE:  SO WE AGREED THE DEFENSE WOULD START OFF

18         TODAY.  AND I BELIEVE IN A MESSAGE TO THE COURT, THE DEFENSE

19         HAD SUGGESTED THEY WOULD BE SPEAKING ON ECONOMIC ESPIONAGE.  I

20         DON'T HAVE THE MESSAGE IN FRONT OF ME, SO IF I'M

21         MISREPRESENTING IT, I APOLOGIZE.

22                   MR. GUGELMANN:  WE WILL BE.  THERE ARE A COUPLE OF

23         POINTS THAT WE ARE GOING TO ADDRESS ON THE TRADE SECRET SIDE AS

24         WELL, BUT THE BULK OF THE DISCUSSION TODAY WILL BE ABOUT THE

25         ECONOMIC ESPIONAGE.

1          THE COURT:  OH, WONDERFUL.  OKAY.  ALL RIGHT.

2          WELL, COUNSEL, I'M HAPPY TO HEAR YOUR COMMENTS AND GET

3    YOUR ASSISTANCE ON THE ISSUES.

4          MR. GUGELMANN:  THANK YOU.

5          AS THE COURT KNOWS, WE HAVE WORKED HARD WITH THE

6    GOVERNMENT TO REALLY NARROW THE ISSUES HERE THAT THE COURT HAS

7    TO DECIDE.

8          WE STIPULATED TO PAGES AND PAGES OF FACTS, AND ARE DOING

9    THIS PROCEDURE IN LIEU OF WHAT WOULD HAVE BEEN A PRETTY LENGTHY

10   JURY TRIAL BECAUSE WE THINK THE FACTS MAY BE ENTIRELY, BUT

11   CERTAINLY THE VAST MAJORITY ARE IN CONFLICT.

12         THE QUESTION THAT I WANT TO TALK ABOUT TODAY IS THE

13   COURTS -- THE THINGS THAT REMAIN TO BE DECIDED IS BASICALLY HOW

14   THE COURT APPLIES THOSE FACTS THAT ARE LARGELY AGREED UPON TO

15   THE SPECIFIC ELEMENTS OF THE CASE.  AND THERE ARE A COUPLE OF

16   ELEMENTS ON EACH SIDE ON THE TRADE SECRET SIDE AND ON THE

17   ECONOMIC ESPIONAGE SIDE THAT I WANT TO FOCUS ON.

18         ON THE TRADE SECRET SIDE, I WOULD LIKE TO START WITH THE

19   STANDARD -- AND I APPRECIATE THE COURT HAS LOOKED AT THE -- HAS

20   BEEN LOOKING AT THE MODEL INSTRUCTIONS.  I THINK WE STARTED

21   WITH CLARITY HERE THROUGH THE JOINT MEMORANDUM THAT WE

22   SUBMITTED ON THE INSTRUCTIONS WITH REGARD TO THE ELEMENTS.

23         SOME OF THAT CLARITY WAS LOST, IT SEEMED TO US, IN THE

24   BRIEFING.  AND SPECIFICALLY IN THE GOVERNMENT'S REBUTTAL BRIEF,

25   WHICH IS DOCKET 323 AT PAGE 2, THE GOVERNMENT WROTE THAT IT

1    "DOES NOT NEED TO PROVE THAT THE DEFENDANT BELIEVED THE

2    INFORMATION WAS A TRADE SECRET."

3          THAT'S THE LAW.  THE GOVERNMENT DOES HAVE TO PROVE THAT.

4    AS TO THE SUBSTANTIVE COUNTS, THE GOVERNMENT NEEDS TO PROVE

5    THAT THE INFORMATION WAS TRADE SECRET AND THE DEFENDANTS KNEW

6    IT.  AS TO THE CONSPIRACY COUNTS, IT NEEDS TO PROVE THAT THE

7    DEFENSE BELIEVED IT WAS A TRADE SECRET.

8          AND WHAT THAT MEANS, AND THIS IS WHY I SAY THINGS JUST GOT

9    A LITTLE UNCLEAR, RATHER THAN WE ACTUALLY HAVE A SUBSTANTIVE

10   DISAGREEMENT WITH THE GOVERNMENT, I THINK THE GOVERNMENT THEN

11   ACCURATELY ON PAGE 3 OF ITS BRIEF, SETS OUT THAT WHEN IT COMES

12   TO KNOWLEDGE THAT SOMETHING IS A TRADE SECRET, THE DEFENDANT

13   HAS TO KNOW ALL OF THE CONSTITUENT PARTS OF THE DEFINITION.

14   THE DEFENDANT HAS TO KNOW THAT IT WAS PROPRIETARY, THE

15   DEFENDANT HAS TO KNOW THAT THE OWNER TOOK REASONABLE MEASURES

16   TO PROTECT IT, AND THE DEFENDANT HAS TO KNOW THAT THERE WAS

17   SOME VALUE THAT WAS GENERATED BY VIRTUE OF THAT SECRECY.

18          AND I FOCUS ON THE KNOWLEDGE ELEMENT BECAUSE THAT'S REALLY

19   WHERE THE DIFFERENCE IS BETWEEN THE PARTIES, I THINK, ON THE

20   TRADE SECRET COUNTS.

21          WITH RESPECT TO THE AVAGO SIDE OF THE STORY, AND AS THE

22   COURT IS AWARE AT THIS POINT, DR. PANG, CODEFENDANT DR. PANG

23   WORKED AT AVAGO, DR. ZHANG WORKED AT SKYWORKS.

24          WITH RESPECT TO THE AVAGO SIDE, THE DEFENSE SUBMITS THAT

25   THERE WAS JUST INSUFFICIENT EVIDENCE THAT HE KNEW THOSE

1    MATERIALS WERE TRADE SECRET.

2        THERE'S NO EVIDENCE, FOR EXAMPLE, THAT HE KNEW WHAT STEPS

3    AVAGO HAD TAKEN TO PROTECT THEM, THAT HE KNEW THAT AVAGO

4    DERIVED A BENEFIT FROM THEIR SECRECY.  SO THAT'S ON THE AVAGO

5    SIDE.  BECAUSE HE DIDN'T WORK THERE.

6        ON THE SKYWORKS SIDE, THERE'S A DIFFERENT RELATED ISSUE.

7    ALTHOUGH BEFORE I GET TO THAT, I WANT TO TALK VERY SPECIFICALLY

8    ABOUT THE SKYWORKS-RELATED COUNTS.

9        WE STARTED THIS CASE -- AND THIS IS NOT SOMETHING THAT WAS

10   SPECIFIED IN OUR BRIEF, SO I WANT TO BE CLEAR ABOUT THIS -- WE

11   STARTED THIS CASE WITH THREE SETS OF CHARGES RELATED TO

12   SKYWORKS DOCUMENTS, AND THE GOVERNMENT HAS SINCE DISMISSED TWO

13   OF THOSE.  SO WHERE THAT LEAVES US WITH RESPECT TO SKYWORKS IS

14   THAT ONLY COUNT 11 REMAINS ON THE TRADE SECRET SIDE, AND IT

15   CORRESPONDS TO COUNT 26 ON THE ECONOMIC ESPIONAGE SIDE, SO TWO

16   DIFFERENT COUNTS.

17       AND IF THE COURT LOOKS AT THE ALLEGATION IN THAT COUNT

18   SPECIFICALLY, THAT CONCERNS A POWERPOINT ENTITLED "TEMPERATURE

19   COMPENSATED BAW," B-A-W, "RESONATOR WITH EMBEDDED SILICON

20   DIOXIDE LAYER UNDERNEATH PIEZOELECTRIC LAYER."

21       THIS IS --

22           THE COURT:  THIS IS COUNT -- I'M SORRY, 26?

23           MR. GUGELMANN:  THIS IS COUNT 11 AND 26.

24           THE COURT:  YES.

25           MR. GUGELMANN:  AND THAT'S DESCRIBED IN THE

1    STIPULATION, ALSO AT PARAGRAPH 15 EEE, TRIPLE E.

2          SO JUST WITH RESPECT --

3              THE COURT:  AND THIS IS AN AUGUST 28, 2010 E-MAIL, IS

4    THAT THE GRAVAMEN OF THIS ALLEGATION?

5              MR. GUGELMANN:  CORRECT.  THAT THIS PARTICULAR

6    DOCUMENT WAS SENT IN THAT E-MAIL ON AUGUST 28TH.

7          BUT WHAT I WANT TO JUST DIRECT THE COURT TO, IS IF THE

8    COURT COMPARES THAT E-MAIL AND WHAT THAT POWERPOINT WAS ABOUT,

9    THE BAW RESONATOR WITH IMBEDDED SILICON DIOXIDE LAYER, TO THE

10   CATEGORIES OF INFORMATION THAT THE PARTIES HAVE STIPULATED WERE

11   THE PROPRIETARY MATERIAL AT ISSUE WITH RESPECT TO SKYWORKS,

12   THOSE DON'T MATCH, THERE'S NO CATEGORY OF INFORMATION THAT WAS

13   INCLUDED IN THE POWERPOINT THAT'S DESCRIBED IN COUNTS 11 AND

14   26.

15         SO ON THAT COUNT, SPECIFICALLY WITH RESPECT TO SKYWORKS,

16   THE GOVERNMENT JUST HASN'T PROVED THAT THAT'S A TRADE SECRET.

17         MORE BROADLY ON SKYWORKS, THE ISSUE AS IT RELATES TO THE

18   MENTAL STATE THAT I WAS DISCUSSING EARLIER, IS THAT ALTHOUGH

19   DR. ZHANG OF COURSE KNEW WHAT WAS PROPRIETARY AND WHAT WASN'T

20   AT SKYWORKS, HE DID NOT DO ANYTHING WITH ANY OF THE MATERIAL

21   THAT THE GOVERNMENT SAYS IS A SKYWORKS TRADE SECRET UNTIL AFTER

22   SKYWORKS HAD LEFT THE FILTER BUSINESS.

23             THE COURT:  WHAT'S THE SIGNIFICANCE OF THAT?

24             MR. GUGELMANN:  IT GOES TO TWO ELEMENTS.

25         IT GOES FIRST TO DR. ZHANG'S KNOWLEDGE THAT IT WAS A TRADE

1       SECRET.  BECAUSE IN ORDER FOR HIM TO KNOW THAT'S A TRADE

2       SECRET, THE OWNER IS DERIVING SOME BENEFIT FROM ITS SECRECY.

3       AND BECAUSE SKYWORKS IS OUT OF THE BUSINESS, AS FAR AS HE

4       UNDERSTANDS, THAT MATERIAL IS NOT AVAILABLE TO SKYWORKS

5       ANYMORE.

6                   THE COURT:  WHY NOT?

7                   MR. GUGELMANN:  BECAUSE THEY ARE NOT DOING THAT WORK.

8                   THE COURT:  DO THEY -- THEY EXIST THEMSELVES FROM

9       THAT MARKET, BUT DO THEY NONETHELESS RETAIN SOME TYPE OF

10      INTEREST THAT THEY COULD REENTER THE MARKET FOR EXAMPLE?

11                  MR. GUGELMANN:  WELL, SO WHAT THE PARTIES HAVE

12      STIPULATED TO IS THAT WHEN SKYWORKS LEFT THE BUSINESS, IT WAS

13      OUT TOTALLY, BUT IT SOLD SOME OF ITS PATENTS AND OTHER IP TO

14      OTHER ENTITIES, INCLUDING AVAGO.

15                  THE COURT:  BUT NOT THIS.

16                  MR. GUGELMANN:  WELL, WE DON'T HAVE ANY INFORMATION

17      ON WHETHER THEY SOLD THIS OR NOT.

18          BUT MORE IMPORTANTLY, WE DON'T HAVE ANY INFORMATION THAT

19      DR. ZHANG KNEW THAT THIS STUFF WAS BEING USED BY SOMEONE ELSE

20      NOW.  AS FAR AS HE WAS CONCERNED, THIS STUFF WAS NOT IN USE, NO

21      ONE NEEDED IT.

22                  THE COURT:  I GUESS I CAPTURED THAT IN YOUR BRIEFING,

23      AND I WAS JUST CURIOUS ABOUT WHETHER OR NOT THAT ACTS

24      PROPHYLACTICALLY FOR ANYONE TO COME IN AND USE THAT

25      INFORMATION.

1     MR. GUGELMANN:  WELL, IF THEY DON'T KNOW THAT IT'S A

2  TRADE SECRET, THEN YES, THERE'S NO CRIMINAL PROHIBITION ON

3  USING THAT UNLESS THERE'S PROOF THAT THEY KNEW IT WAS A TRADE

4  SECRET.

5     AND THE FACT THAT SKYWORKS IS OUT OF THE BUSINESS GOES TO

6  A DIFFERENT ELEMENT AS WELL, WHICH IS THE INTENT TO INJURE THE

7  OWNER OF THE TRADE SECRET.

8     WHAT WE HAVE SEEN IN THE EVIDENCE HERE IS THAT DURING THE

9  PERIOD WHEN SKYWORKS WAS STILL BUILDING FILTERS, DR. ZHANG

10  REFUSED TO PROVIDE INFORMATION THAT HE UNDERSTOOD WAS

11  CONFIDENTIAL.  HE LATER DID SEND THESE MATERIALS THAT THE

12  GOVERNMENT ALLEGES ARE TRADE SECRETS, BUT HE DIDN'T DO THAT

13  UNTIL THEY WERE DONE WITH THE BUSINESS.  SO THAT GOES TO

14  WHETHER HE INTENDED THAT HIS ACTIONS WOULD HURT SKYWORKS.

15     THE COURT:  SO IF COCA-COLA DECIDES TO STOP MAKING

16  COCA-COLA AND GET OUT OF THAT BUSINESS, BUT CONTINUES TO MAKE

17  SPRITE OR ONE OF THEIR OTHER FLAVORS, DOES THAT MEAN THAT

18  SOMEONE COULD SAY, WELL, COKE IS OUT OF THE BUSINESS, I'M NOW

19  GOING TO MOVE IN AND USE THE SECRET FORMULA, ASSUMING THEY HAVE

20  IT.  IS THAT THE SAME TYPE OF THING, OR IS THAT AN UNFAIR

21  COMPARISON?

22     MR. GUGELMANN:  NO, I THINK THAT'S A SIMILAR

23  COMPARISON.

24     I THINK THERE COULD BE ALL TYPES OF CIVIL PROBLEMS WITH

25  DOING THAT.  IT'S STILL COCA-COLA'S PROPERTY, THAT RECIPE.  BUT

1    WHERE A CRIMINAL CASE I THINK WOULD FALTER IN THAT SCENARIO, IS

2    ON THAT PERSON'S INTENT TO HARM COCA-COLA.

3         BECAUSE IF AS FAR AS THAT PERSON KNOWS, UNDER THESE FACTS,

4    COCA-COLA IS DONE, THE COCA-COLA COMPANY IS NO LONGER MAKING

5    THAT PRODUCT, THERE'S NO INDICATION THAT THEY KNOW SOMEONE ELSE

6    IS GOING TO MAKE IT, AND SO THERE'S A NEW OWNER OF THAT IP.

7         SO IN TERMS OF A CRIMINAL CASE AS OPPOSED TO MAYBE A CIVIL

8    CASE, I THINK THE FACT THAT THERE'S NO LONGER ANY EVIDENCE OF

9    AN INTENT TO HARM THE COCA-COLA COMPANY AS THE OWNER OF THE IP

10   WOULD MEAN THAT THERE WOULD BE NO CONVICTION ON THAT FRONT.

11         THE COURT:  IS THERE ANY EVIDENCE HERE ABOUT NDA'S

12   THAT THE PARTIES ENTERED INTO, AND IF SO, DO THOSE HAVE ANY

13   IMPACT ON INTENT?

14         MR. GUGELMANN:  SO WHAT THE PARTIES HAVE STIPULATED

15   TO ARE THE STEPS THAT THESE COMPANIES TOOK TO PROTECT THE

16   PROPERTY AT ISSUE.  AND THAT'S IN OUR STIPULATIONS WITH RESPECT

17   TO SKYWORKS, AT PARAGRAPH 11.

18         I DON'T BELIEVE THERE IS ANY EVIDENCE IN THE RECORD AS TO

19   NDA'S ON ANY PARTICULAR PIECE OF INFORMATION.  I THINK IF THE

20   COURT HAD INFORMATION THAT EVEN AFTER SKYWORKS WAS DONE, THERE

21   WAS REASON FOR THE SKYWORKS EMPLOYEES TO UNDERSTAND SKYWORKS

22   HAD SAID, WE ARE DONE BUT WE ARE HANGING ON TO THIS BECAUSE

23   IT'S STILL VALUABLE TO US.  WHETHER THAT WAS IN THE FORM OF AN

24   NDA OR SOMETHING ELSE, I THINK THAT'S SOMETHING THE COURT CAN

25   CONSIDER.

1        WE DON'T HAVE THAT HERE.  WHAT WE HAVE IS SKYWORKS IS OUT,

2   AND WHEN DR. ZHANG IS ASKED BY THE AGENTS ABOUT THESE

3   DOCUMENTS, HIS RESPONSE, A COUPLE OF DIFFERENT TIMES IN THOSE

4   INTERVIEWS IS, BUT THEY WERE DONE WITH THAT.

5        SO WE HAVE SOME INSIGHT INTO DR. ZHANG'S STATE OF MIND

6   WITH RESPECT TO THIS ELEMENT OF THE INTENT TO INJURE SKYWORKS

7   OR USE MATERIAL THAT HE KNEW WAS SKYWORKS' TRADE SECRET.

8        TURNING TO ECONOMIC ESPIONAGE COUNTS, THOSE REALLY BUILD

9   ON THE TRADE SECRET COUNTS.

10        AS THE COURT KNOWS, ECONOMIC ESPIONAGE IS BASICALLY ALL

11   THE ELEMENTS OF TRADE SECRET, PLUS A COUPLE ADDITIONAL

12   ELEMENTS.  I GUESS, TECHNICALLY, MINUS THE INTENT TO INJURE,

13   PLUS SOME ADDITIONAL ELEMENTS.

14        SO THE COURT COULD FIND THAT DR. ZHANG WORKED IN THE U.S.

15   AT SKYWORKS, THAT DR. ZHANG TOOK SKYWORKS TRADE SECRETS, THAT

16   HE BROUGHT THEM TO CHINA, THAT HE SET UP A COMPANY, THAT HE

17   USED THEM TO MANUFACTURER A COMPETING PRODUCT.

18        IT COULD FIND ALL THOSE THINGS.  THAT WOULD BE CRIME, THAT

19   WOULD BE THEFT OF TRADE SECRETS, BUT IT WOULD NOT BE ECONOMIC

20   ESPIONAGE, NOTWITHSTANDING THE FACT THAT IT HAD HAPPENED IN

21   CHINA.

22        THE TWO ADDITIONAL ELEMENTS THAT THE GOVERNMENT HAS TO

23   PROVE THERE ARE THE PRESENCE OF A CHINESE INSTRUMENTALITY AND A

24   CONNECTION BETWEEN THE CHARGED TRADE SECRETS AND A BENEFIT TO

25   THAT INSTRUMENTALITY.

1      SO THEY MUST HAVE USED, POSSESSED, DISTRIBUTED THE TRADE

2   SECRET DOCUMENTS IN ORDER TO CONFER A BENEFIT ON THAT

3   INSTRUMENTALITY FOR THE GOVERNMENT TO BE ABLE TO MOVE BEYOND

4   THEFT OF TRADE SECRETS TO ECONOMIC ESPIONAGE.  AND ITS ON THOSE

5   ELEMENTS THAT THE GOVERNMENT'S CASE FALTERS WITH RESPECT TO

6   ECONOMIC ESPIONAGE.

7      AND I WANT TO LAY OUT A LITTLE BIT OF THE FACTS HERE.  WE

8   PUT THIS IN OUR BRIEF, THE GOVERNMENT TOUCHED ON IT.  I THINK

9   IF WE HAD A JURY TRIAL, THE COURT WOULD BE STEEPED IN THIS AT

10  THIS POINT.  BUT SINCE WE HAVEN'T, I JUST WANT TO SET THE STAGE

11  A LITTLE BIT.

12     THE TECHNOLOGY THAT WE ARE TALKING ABOUT HERE IS MEMS,

13  M-E-M-S, WHICH IS MICROELECTROMECHANICAL SYSTEMS.  THAT'S A

14  VERY BROAD RANGE OF DEVICES.  ALL SORTS OF TINY MACHINES,

15  BASICALLY ANYWHERE FROM A COUPLE OF MICRONS TO A COUPLE OF

16  MILLIMETERS IN SIZE.  IT COULD BE PUMPS, IT COULD BE SWITCHES,

17  ACCELEROMETERS, GYROSCOPES.  I THINK THE AIR PRESSURE SENSOR IN

18  YOUR CAR TIRES IS A MEMS DEVICE.

19     SO THERE'S A WIDE ARRAY OF THESE THINGS.

20        THE COURT:  YOU DRIVE A NEWER CAR THAN I DO.

21        MR. GUGELMANN:  MINE DOESN'T HAVE IT, YOUR HONOR.

22     IN A MEMS LABORATORY, IT'S A FACILITY WHERE ENGINEERING

23  STUDENTS CAN STUDY THESE KINDS OF DEVICES, LEARN HOW THEY ARE

24  BUILT, LEARN HOW TO DESIGN THEM.

25     SO WE HAVE ON THE ONE HAND, IN THIS CASE, TIANJIN

1    UNIVERSITY, TJU, AND ITS MEMS LABORATORY.  THERE'S A SUBSET OF

2    MEMS DEVICES THAT ARE FILTERS.  AND THERE'S A SUBSET OF FILTERS

3    THAT ARE BAW, BULK ACOUSTIC WAVE FILTERS, AND THERE'S A SUBSET

4    OF THOSE THAT ARE FBAR FILTERS, THE FILM BULK ACOUSTIC

5    RESONATOR FILTERS THAT ARE HERE, ROFS.

6         THE DEFENDANT'S COMPANY IN CHINA WAS A FABRICATION

7    FACILITY FOR FBAR FILTERS SPECIFICALLY.  SO NOT MEMS, BROADLY

8    SPEAKING, NOT A RESEARCH FACILITY FOR MEMS, BROADLY SPEAKING,

9    BUT A FABRICATION FACILITY FOR BULK FABRICATION IN A COMMERCIAL

10   SETTING OF THIS TYPE OF FILTER.

11        SO WHEN THE COURT IS LOOKING AT THE ECONOMIC ESPIONAGE

12   CHARGES AND WHETHER THE GOVERNMENT HAS PROVED THIS ADDITIONAL

13   ELEMENT OF CHINESE INSTRUMENTALITY AND A BENEFIT THROUGH THE

14   USE OF A TRADE SECRET, IT'S IMPORTANT TO LOOK AT THOSE

15   SEPARATELY FOR THE TWO ENTITIES, FOR THE TJU MEMS LAB ON THE

16   ONE HAND AND FOR ROFS ON THE OTHER.

17        I'M GOING TO START WITH TJU, BECAUSE ONE ELEMENT THAT THE

18   GOVERNMENT HAS TO PROVE THERE IS NOT IN DISPUTE.  WE DON'T

19   DISPUTE THAT TJU IS A CHINESE GOVERNMENT INSTRUMENTALITY.

20        WE ALSO DON'T DISPUTE THAT DR. ZHANG WAS INTENDING TO

21   BENEFIT TJU.  AND THE FACTS ARE HE WENT OVER THERE TO HELP THEM

22   BUILD THEIR MEMS LAB.  AND WE DON'T DISPUTE THAT HELPING THEM

23   ACQUIRE A MEMS LABORATORY IS A BENEFIT.

24        BUT THE GOVERNMENT DOESN'T JUST HAVE TO PROVE THOSE

25   THINGS.  THE GOVERNMENT HAS TO PROVE THAT THAT BENEFIT WAS

1    GOING TO FLOW THROUGH THE USE IN SOME WAY OF THE CHARGED TRADE

2    SECRETS.  BECAUSE IT'S NOT A CRIME TO GO TO CHINA AND HELP TJU

3    SET UP A MEMS LAB, IT'S ONLY A CRIME TO DO THAT IF YOU ARE

4    DOING IT BY USING THE TRADE SECRET.

5         AND THE TRADE SECRETS HERE GO TO DESIGN AND MANUFACTURE OF

6    FBARS, THEY DON'T GO TO ESTABLISHING A MEMS LAB.  AND THE

7    GOVERNMENT HAS NOT SHOWN THAT ANY OF THOSE TRADE SECRETS WERE

8    ACTUALLY USED IN ANY WAY TO BENEFIT TJU, WHETHER IT'S THROUGH

9    THE MEMS LAB OR ANYTHING ELSE, FRANKLY.

10        THEY SAY IN THEIR BRIEF, OF COURSE THERE'S ALL KINDS OF

11   CONNECTIONS BETWEEN THE DEFENDANTS AND TJU, AND THE DEFENDANTS

12   WERE IN THE U.S. AND THEY CAME TO CHINA AND THEY WERE WORKING

13   FOR TJU AND WORKING IN THE MEMS LAB.  AND ALL OF THAT CAN BE

14   TRUE, AND IF THERE WERE TRADE SECRETS INVOLVED IN THE MOVE TO

15   CHINA, IT COULD BE THEFT THE TRADE SECRETS.  BUT WITHOUT A TIE

16   BETWEEN THOSE TRADE SECRETS AND THE MEMS LAB OR SOME OTHER

17   BENEFIT TO TJU, THEY DON'T GET THERE ON ECONOMIC ESPIONAGE.

18        THEY ALLEGE TWO DIFFERENT SORT OF POTENTIAL CONNECTIONS

19   THAT WE SEE BETWEEN THE ACTUAL TRADE SECRET CHARGE DOCUMENTS

20   AND TJU.

21        ONE IS THAT THEY SAY BEFORE DR. ZHANG WENT TO WORK AT TJU,

22   HE USED STOLEN TRADE SECRETS TO APPLY FOR PATENTS.  AND LET'S

23   ASSUME THAT THAT'S PROVED, LET'S ASSUME THAT HE DID USE TRADE

24   SECRETS TO DO THAT.  WHAT THE GOVERNMENT HAS NOT SHOWN, IS ANY

25   EVIDENCE THAT THOSE PATENT APPLICATIONS WERE A BENEFIT OR WERE

1    INTENDED TO BENEFIT OR IN FACT DID BENEFIT TJU.

2         IT'S NOT HARD TO IMAGINE SORT OF WHAT THAT THE PROOF MIGHT

3    BE.  FOR EXAMPLE, IF THE DEFENDANTS HAD APPLIED FOR PATENTS IN

4    TJU'S NAME INSTEAD OF THEIR OWN, THAT WOULD SEEM TO INDICATE

5    THAT THEY WERE INTENDING TO BENEFIT TJU IN SOME WAY.

6         IF TJU HAD USED PATENTS TO TRY TO CONVINCE STUDENTS TO

7    COME STUDY THERE, TO DO FUNDRAISING FOR THE SCHOOL, IF THAT'S

8    SOMETHING THE CHINESE SCHOOLS TO, I DON'T KNOW, ALL OF THOSE

9    ARE WAYS IN WHICH YOU COULD SUPPOSE THAT THE PATENTS WERE

10   ACTUALLY BENEFITTING TJU.

11        BUT THEY DON'T HAVE ANY OF THAT, ALL THEY SAY IS THAT IT'S

12   ONLY LOGICAL THAT BECAUSE THEY APPLIED FOR THE PATENTS AND THEN

13   THEY WENT TO TJU, THERE MUST BE A BENEFIT TO TJU.

14        THE COURT:  WELL, THEY LOOK -- THEY TURN TO, I THINK

15    IT'S EVIDENCE STIPULATION 15, IS IT, AND THERE'S VARIOUS

16   PARAGRAPHS, M, N, J, K, AND OTHERS THAT SUGGEST THAT THERE'S

17   THIS COLLOQUY, THERE'S A CONTINUING CONVERSATION BETWEEN THE

18   UNIVERSITY, ITS REPRESENTATIVES, UP TO AND INCLUDING AND

19   MEETING IN 2008 IN SAN JOSE WHERE THE DEAN OF THE SCHOOL COMES

20   TO SAN JOSE, CALIFORNIA AND MEETS WITH YOUR CLIENT AND OTHERS.

21        MR. GUGELMANN:  RIGHT.

22        THE COURT:  MY SENSE IS THAT IT SEEMS THAT THE

23   GOVERNMENT SUGGESTS THAT ALL OF THIS, AND ONE OF THE QUESTIONS

24   I HAVE FOR THEM AND YOU IS, IS THEIR CASE BUILT ON

25   CIRCUMSTANTIAL EVIDENCE THAT THE COURT COULD FIND?

1        BUT ALL OF THAT SEEMS TO SUGGEST, THAT IS THOSE PARAGRAPHS

2   I CITED, STIPULATED EVIDENCE, SUGGEST THAT THERE WAS A

3   CONTINUING CONVERSATION THAT THE THEME MIGHT BE THAT THERE WAS

4   A PLAN TO BUILD A MEMS LAB OF SOME SORT IN CHINA USING

5   TECHNOLOGY FROM THE UNITED STATES, FORMER EMPLOYERS OF THE

6   PARTIES, AND THERE WAS INITIAL FUNDING SOUGHT FROM VC'S AND

7   OTHER ANGELS, ET CETERA, BUT THERE WAS CONCERN FROM OTHER VC'S

8   BECAUSE OF THE -- PERHAPS BECAUSE OF THE IP AND THE CONCERNS OF

9   THE IP THAT WAS GOING TO BE USED TO ESTABLISH THE LAB; AND

10  THEREFORE, THE MILLIONS OF DOLLARS NEEDED TO SEED THE PROJECT

11  WERE DISRUPTED, WHICH CAUSED THEN, THE PARTIES, THE

12  CONSPIRATORS, IF YOU WILL, JUST SAYING THAT, TO MOVE TO TJU,

13  THE INSTRUMENTALITY, AS YOU SUGGESTED OF THE GOVERNMENT, TO

14  DEVELOP THE LAB THERE, AND IN THAT WAY TO ESTABLISH THEIR LAB.

15       THE CONVERSATIONS THAT THOSE SECTIONS AND PARAGRAPHS THAT

16  I CITED SEEM TO SAY IS, WE CAN DO THIS, IT CAN BE PROFITABLE,

17  WE CAN USE CHINESE LABOR AND AVOID THE HIGH COST OF AMERICAN

18  LABOR, AND WE WILL BE PROFITABLE HERE, IN CHINA.

19       SO DON'T THOSE STRINGS OF CONVERSATION SEEM TO SUGGEST

20  THAT THAT WAS THE PLAN, AND THAT USING THAT INFORMATION THROUGH

21  THE INSTRUMENTALITY OF THE UNIVERSITY WAS WHAT THEY REFOCUSED

22  ON AND ENTRENCHED THEIR EFFORTS TOWARDS?

23            MR. GUGELMANN:  WELL, WHAT THOSE CONVERSATIONS

24  CERTAINLY ESTABLISH IS THAT THERE WAS AN INITIAL PLAN TO SEEK

25  VENTURE FUNDING IN THE U.S.

1      THERE WERE CONVERSATIONS ABOUT POSSIBLE IP ISSUES.  NOW,

2  WE DON'T HAVE ANY EVIDENCE AS TO WHAT THOSE CONVERSATIONS

3  CONSISTED OF.  IT'S CERTAINLY NOT OUT OF THE ORDINARY THAT IF

4  YOU ARE TALKING ABOUT PEOPLE WHO WERE LEAVING ONE COMPANY TO

5  START A COMPETITOR, THAT ANYONE INVESTING IN THAT COMPANY IS

6  GOING TO BE CONCERNED ABOUT IP ISSUES.  AND THAT'S NOT BECAUSE

7  PEOPLE ASSUME THERE'S THEFT, IT'S BECAUSE PEOPLE ASSUME THERE'S

8  LITIGATION RISK IN THAT VENTURE, WHETHER OR NOT THERE'S THEFT.

9      THE COURT:  SOME OF THE E-MAILS FROM MR. PANG, I

10  THINK IT IS, WEI PANG, I THINK SOME OF THE E-MAILS HE SENT

11  EXPRESSED GREAT CONCERN OF AVAGO, I THINK, AND USING THEIR

12  INFORMATION.

13      AND IT'S ALMOST LIKE, YOU KNOW, HE DIDN'T USE THE WORDS,

14  MY WORDS, KEEP IT ON THE DOWN LOW, KEEP IT QUIET ABOUT AVAGO,

15  THERE WAS A LATER, WAS IT 2010 OR 2009, I THINK THERE WAS

16  EXPRESSION OF CONCERN THAT THE DOCUMENTS YOU SENT US ACTUALLY

17  HAVE AVAGO LOGOS, AND DON'T DO THAT.

18      MR. GUGELMANN:  SO I THINK THIS IS EXACTLY WHERE THE

19  COURT IS FOCUSED ON THE RIGHT ISSUE AND WHERE THE COURT NEEDS

20  TO BE LOOKING VERY CAREFULLY AT WHAT ELEMENT THOSE FACTS GO TO.

21      SO YES, THERE ARE THESE CONVERSATIONS SAYING LET'S NOT USE

22  OUR PERSONAL E-MAILS AT WORK, THERE IS THE LATER CONVERSATION

23  OF THE E-MAIL THAT THE COURT POINTS OUT THAT THERE WAS "AVAGO"

24  ON A DOCUMENT SOMEWHERE.

25      ALL OF THAT, IF THE COURT FINDS THAT CONVINCING EVIDENCE,

1    COULD GO TO SHOW THEFT OF TRADE SECRETS.  THAT COULD GO TO SHOW

2    THESE DEFENDANTS HAD AVAGO INFORMATION, THEY WERE TRYING TO

3    HIDE THAT FACT FROM AVAGO.

4        THERE ARE OTHER EXPLANATIONS FOR THOSE, I THINK, I THINK

5    THE IDEA THAT YOU DON'T WANT TO CALL ATTENTION TO THE FACT THAT

6    YOU ARE STARTING A COMPETITOR WHILE YOU ARE STILL AT YOUR OLD

7    JOB DOESN'T NECESSARILY SPEAK TO THEFT OF TRADE SECRETS, BUT I

8    AGREE THAT'S ALL EVIDENCE THAT THE COURT COULD LOOK AT TO REACH

9    A CONCLUSION ON TRADE SECRETS.

10        THE MISSING PIECE THERE NOW THOUGH, IS THE LINK BETWEEN

11    ANY OF THAT AND TJU.  AND I WANT TO JUST GET BACK TO THE

12    COURT'S QUESTION OF WHERE WE STARTED ON THESE PATENTS BECAUSE

13    THERE'S CONVERSATION ON THESE PATENTS.  AND THAT THE NEXUS 102

14    THAT THE GOVERNMENT IS SEEKING TO DRAW BETWEEN THE SPECIFIC

15    DOCUMENTS AND THE BENEFIT TO TJU.

16        EVERYTHING THAT THE COURT IS SAYING SORT OF GENERALLY

17    ABOUT A PLAN TO START A BUSINESS IN CHINA WITH STOLEN TRADE

18    SECRETS, ASSUMING THE COURT FINDS THAT, DOESN'T PROVE ECONOMIC

19    ESPIONAGE, IT PROVES THEFT OF TRADE SECRETS.

20        ON THE APPLICATIONS SPECIFICALLY, WHAT THE GOVERNMENT

21    POINTS TO IS THERE'S CONVERSATIONS ABOUT -- I'M SORRY, THERE'S

22    PATENT APPLICATIONS, AND THEN THEY SORT OF CULMINATE WITH THIS

23    E-MAIL, THIS IS CITED IN THEIR BRIEF, DOCKET 323 AT PAGE 11,

24    WHERE THERE'S AN E-MAIL FROM WEI PANG WHO WRITES TO SOME OF THE

25    OTHER DEFENDANTS THAT TJU HAS SUGGESTED TO SUBMIT THE PATENT

1    APPLICATIONS BEFORE WE SIGN ANY CONTRACT WITH TJU.

2         SO THAT'S THE LINK THAT WE SEE BETWEEN THE PATENT

3    APPLICATIONS AND TJU.  THE GOVERNMENT IS SAYING THAT MEANS TJU

4    IS GOING TO BENEFIT FROM THE PATENT APPLICATIONS.

5         I DON'T SEE THAT HERE.  I SEE TJU SAYING WE DON'T WANT

6    THAT, DO THAT BEFORE YOU GET HERE.  IF ANYTHING, IT'S TJU

7    DISASSOCIATING ITSELF FROM THE PATENT APPLICATIONS, NOT TJU

8    SAYING HERE'S HOW WE WANT THESE PATENT APPLICATIONS TO BENEFIT

9    US.

10             THE COURT:  SO WHAT IS THE BENEFIT?  THAT WAS THE

11   QUESTION I HAD FOR BOTH OF YOU, WHAT'S A BENEFIT?

12             MR. GUGELMANN:  IN RESPECT TO THESE --

13             THE COURT:  WHAT IS THE BENEFIT?  IS TJU BENEFITTED

14   BY HAVING THEM, THAT IS, YOUR CLIENT AND OTHERS, BE PROFESSORS?

15   THAT WOULD SEEM TO BE A BENEFIT TO THEM?

16             MR. GUGELMANN:  I WOULD AGREE THAT'S A BENEFIT.

17             THE COURT:  THEY HAVE THE TECHNOLOGY, THEY ARE FORMER

18   UNITED STATES EMPLOYEES AT UNITED STATES COMPANIES AND THEY

19   BRING THAT WITH THEM.  AND ISN'T THAT A BENEFIT?

20             MR. GUGELMANN:  I THINK THAT THE COURT COULD FIND

21   THAT'S A BENEFIT.  I THINK THE MORE CONCRETE BENEFIT HERE IS

22   THE MEMS LAB, AND WE DON'T DISPUTE THAT'S A BENEFIT EITHER.

23             THE COURT:  SURE.

24        THAT'S REALLY KIND OF THE GRAVAMEN WHEN YOU LOOK AT IT;

25   WHAT'S THE BENEFIT?  WHEN YOU LOOK AT TRADE SECRETS, I SUPPOSE

1        YOU THINK THEY ARE STILL -- GOING BACK TO COCA-COLA, THEY ARE

2        TAKING THE COCA-COLA FORMULA, GOING TO A DIFFERENT LOCATION,

3        AND SAYING HERE'S COCA-COLA, NOW YOU COULD CALL IT COCA-CODA

4        AND MAKE IT AND SELL IT AROUND THE WORLD AND IT WILL BE FINE.

5            THAT'S THE REAL -- AND THEY BENEFIT BECAUSE THEY ARE GOING

6        TO GET SALES OF COCA-CODA AND MAKE MONEY OFF OF IT.

7                MR. GUGELMANN:  SO THAT WOULD BE A BENEFIT TO THE

8        DEFENDANT IN THAT CASE, THAT WOULD BE A BENEFIT TO THE

9        DEFENDANT'S COMPANY.  THAT WOULD BE THEFT OF TRADE SECRETS.

10       BUT UNLESS YOU HAD A GOVERNMENT ENTITY --

11               THE COURT:  WELL, IN MY HYPOTHETICAL, THE NEW COMPANY

12       WOULD BE PART OF TJU, IS WHAT I'M SAYING.  IF THEY MANUFACTURED

13       IT.  AND I THINK THERE'S A STIPULATION HERE THAT, I THINK YOU

14       AGREE THAT TJU IS AN INSTRUMENTALITY.

15               MR. GUGELMANN:  CORRECT.  YES, WE AGREE WITH THAT.

16               THE COURT:  RIGHT.  RIGHT.

17               MR. GUGELMANN:  SO IF THE FACTUAL SCENARIO IS TRADE

18       SECRETS ARE BEING STOLEN IN ORDER TO BUILD A COMPANY TOGETHER

19       WITH TJU AND THEN MAKE TJU MONEY, FOR EXAMPLE, THAT COULD BE A

20       BENEFIT THAT THE COURT COULD FIND.

21           WE DON'T HAVE THAT EVIDENCE.  WE DON'T HAVE EVIDENCE THAT

22       THE TRADE SECRETS HERE.  AND THE COURT DOES NEED TO LOOK

23       SPECIFICALLY AT WHAT THE CHARGED TRADE SECRETS ARE, THAT

24       THERE'S ANY NEXUS BETWEEN THOSE TRADE SECRETS AND A BENEFIT TO

25       TJU.

1          THE COURT MIGHT FIND A BENEFIT BETWEEN A NEXUS, RATHER,

2     BETWEEN THOSE TRADE SECRETS AND SOME BENEFIT TO THE DEFENDANTS

3     PERSONALLY THROUGH MONEY OR PRESTIGE OR A COMPANY OR WHATEVER.

4          THE COURT COULD FIND -- I THINK THE GOVERNMENT HAS

5     PROVIDED EVIDENCE ON WHICH THE COURT COULD FIND, IF IT CREDITS

6     THAT EVIDENCE, A NEXUS BETWEEN THOSE TRADE SECRETS AND ROFS,

7     THE FABRICATION FACILITY.

8          BUT THERE IS NO EVIDENCE OF A BENEFIT TO TJU, WHETHER IT'S

9     THROUGH THE MEMS LAB OR ANYTHING ELSE, FROM THESE TRADE

10    SECRETS.

11          THE COURT:  WASN'T THERE A VISIT, WAS IT 2009 WHEN AN

12    AVAGO EMPLOYEE VISITED TJU, AND AT THAT POINT HE VISITED, I

13    THINK HE VISITED THE LAB AND WAS SHOCKED, SHOCKED TO FIND THAT

14    THE WORK BEING DONE THERE CLOSELY, CLOSELY FOLLOWED AVAGO'S

15    WORK.

16          MR. GUGELMANN:  WELL, SO WHAT THE --

17          THE COURT:  WHAT'S THE SIGNIFICANCE OF THAT?

18          MR. GUGELMANN:  WHAT'S IN EVIDENCE ABOUT THAT IS HE

19    TOURED THE TJU MEMS LAB.  AND AS THE PARTIES STIPULATED, THIS

20    IS EXHIBIT 1, PARAGRAPH 15 TTT, THAT HE FORMED THE OPINION THAT

21    IT WAS USING STOLEN AVAGO TECHNOLOGY.

22          WE ARE IN THE MEMS LAB HERE, WE ARE NOT AT ROFS.  AND --

23          THE COURT:  THAT'S PART OF TJU.

24          MR. GUGELMANN:  THAT'S PART OF TJU.

25          HIS CONJECTURE, HIS SUSPICIONS ARE NOT PROOF THAT ANY

1      TRADE SECRETS ARE BEING USED THERE, ESPECIALLY WHEN THE

2      GOVERNMENT HAS NOT PROVIDED ANY EVIDENCE TO ACTUALLY CONNECT

3      THE CHARGED TRADE SECRETS TO THE MEMS LAB.

4              THE COURT:  IS THAT CIRCUMSTANTIAL EVIDENCE OR YOU

5      SAY IT'S NO EVIDENCE AT ALL?

6              MR. GUGELMANN:  IT'S EVIDENCE OF HIS SUSPICIONS.  BUT

7      WHAT HIS SUSPICIONS ARE BASED ON, WE DON'T KNOW.  AND WE KNOW

8      THAT THE GOVERNMENT'S BURDEN HERE IS TO PROVE, BEYOND A

9      REASONABLE DOUBT, THAT A CHARGED TRADE SECRET WAS USED FOR THE

10     BENEFIT OF TJU.

11             THE COURT:  AND THE COURT CONSIDERS, AS IT MUST, THE

12     TOTALITY OF THE CIRCUMSTANCES.

13             MR. GUGELMANN:  CORRECT.

14             THE COURT:  AND THIS IS WHERE I'M INVITING YOU TO

15     COMMENT ON CIRCUMSTANTIAL EVIDENCE BECAUSE IT SEEMS LIKE

16     THAT'S, AT LEAST TO YOUR POINT, THAT'S WHAT THE GOVERNMENT'S

17     CASE IS BUILT ON, CIRCUMSTANTIAL EVIDENCE.

18             MR. GUGELMANN:  IT IS DEFINITELY BUILT ON

19     CIRCUMSTANTIAL EVIDENCE.  BUT WHAT IT IS LACKING, AND OF COURSE

20     THE GOVERNMENT CAN USE CIRCUMSTANTIAL EVIDENCE, BUT WHAT IT IS

21     LACKING IS CIRCUMSTANTIAL EVIDENCE TO FULLY SUPPORT ANY OF

22     THESE SPECIFIC CHARGES, AND THIS IS WHY.

23             THE COURT:  ANY OF THESE ECONOMIC ESPIONAGE CHARGES?

24             MR. GUGELMANN:  CORRECT.  CORRECT.  LEAVING TRADE

25     SECRET ASIDE.

1      AND EVEN ASSUMING, FOR PURPOSES HERE OF THIS DISCUSSION,

2      THE TRADE SECRET IS PROVEN.  EVEN IF WE ASSUME THAT IS

3      ESTABLISHED --

4           THE COURT:  YOU ARE NOT CONCEDING THAT POINT, I

5      CAPTURE THAT.

6           MR. GUGELMANN:  NO.

7      BUT WHAT IS MISSING IS ANY EVIDENCE, DIRECT OR

8      CIRCUMSTANTIAL, THAT SAYS THE DOCUMENTS THAT CHARGED AS A TRADE

9      SECRET IN COUNT WHATEVER, 24, WAS USED TO BENEFIT TJU IN ANY

10     WAY, OR IN ANY OTHER COUNT.

11     AS I SAID, THEY DO DRAW THE LINK IN TWO DIFFERENT WAYS.

12     ONE IS THIS -- ONE IS THE PATENT APPLICATIONS.  AND I THINK

13     THERE, IT'S JUST -- THE GOVERNMENT IS JUST ASKING THE COURT TO

14     ASSUME A FACT THAT IT HASN'T PROVED, THAT THERE IS SOME BENEFIT

15     TO TJU THROUGH THESE PATENT APPLICATIONS.

16          THERE JUST IS NO EVIDENCE THAT --

17          THE COURT:  WAS THE DIRECTION, SUGGESTION, URGING

18     FROM TJU TO CONDUCT THAT APPLICATION PROCESS, AND FOR YOUR

19     CLIENT AND THE OTHERS, DID TJU SOMEHOW SUGGEST TO DO IT THIS

20     WAY, OR WE WOULD LIKE TO HAVE YOU DO IT THIS WAY AND WE ARE

21     GOING TO HAVE YOU COME TEACH, BUT WE WANT YOU TO DO IT IN A

22     CERTAIN WAY.

23          WOULD THAT BE SOME TYPE OF DIRECTION THAT WOULD SUPPORT

24     THE THEORY THAT TJU IS BENEFITTED?

25          MR. GUGELMANN:  IT COULD BE A DIRECTION, BUT THERE'S

1      STILL NO EVIDENCE OF A BENEFIT.  SO IF TJU SAID TO THEM, WE

2      WANT YOU TO APPLY FOR THESE PATENTS BUT LIST YOURSELF AS TJU

3      PROFESSORS BECAUSE WE WANT TO GET CREDIT FOR THAT, THEN I THINK

4      WE WOULD HAVE TO AGREE, TJU CLEARLY IS SEEING THAT THERE'S A

5      BENEFIT TO THESE PATENTS.  AND IF THESE PATENTS ARE BEING

6      APPLIED FOR BASED ON STOLEN TECHNOLOGY, THEN THAT'S POTENTIALLY

7      PROOF OF ECONOMIC ESPIONAGE AS WELL.

8          BUT WE DON'T HAVE THAT.  WHAT WE HAVE IS SOME DISCUSSION

9      ABOUT THE ISSUES OF IP, WHICH IS NOT SURPRISING GIVEN THAT

10     PEOPLE ARE COMING FROM ONE COMPANY AND STARTING -- PLANNING TO

11     START A COMPETING BUSINESS.  AND WE HAVE TJU SAYING, SUBMIT THE

12     PATENT APPLICATIONS BEFORE YOU SIGN ANY CONTRACT WITH US.

13         IF ANYTHING, AS I SAID BEFORE, I THINK THAT TENDS TO

14     INDICATE TJU IS DISTANCING ITSELF FROM THE PATENT APPLICATIONS,

15     NOT EMBRACING THEM BECAUSE THEY GET A BENEFIT FOR IT.

16             THE COURT:  WE HAVE A STATEMENT FROM YOUR CLIENT

17     DURING HIS INTERVIEW WITH THE FBI.  IT STATES SOMETHING AKIN

18     TO, WE DON'T HAVE MEMS LABS IN CHINA, THERE AREN'T MEMS LABS IN

19     CHINA, THEY ARE HERE IN THE UNITED STATES, I STUDIED AT ONE.

20         AND DOESN'T THAT SUGGEST THAT HE KNOWS THAT THERE'S A

21     VACUUM AND THAT THROUGH HIS CONDUCT AND THE CONDUCT WITH HIS

22     COLLEAGUE, CO-DEFENDANTS OR CO-CONSPIRATORS ALLEGEDLY, WERE

23     FILLING THAT VACUUM BY THEIR CONDUCT, AND THAT HE THEN, THROUGH

24     HIS ACTIONS, WAS GOING TO ESTABLISH A THEN ABSENT MEMS LAB AT,

25     PARTICULARLY, TJU, AND THAT REALLY FORMS AND SUGGESTS THE

1    INTENT OF HIS CONDUCT.

2              MR. GUGELMANN:  ALL OF THAT IS TRUE, YOUR HONOR.

3         WE DON'T DISPUTE AT ALL THAT THE MEMS LAB IS A BENEFIT TO

4    TJU.  MEMS LABS EXIST ALL OVER THE WORLD, NOT JUST IN THE

5    UNITED STATES, BUT PRETTY MUCH IN ALL INSTITUTES OF --

6              THE COURT:  EXCEPT AT TJU AT THE TIME.

7              MR. GUGELMANN:  BUT TJU DIDN'T HAVE ONE AND TJU

8    WANTED ONE.  THAT'S A BENEFIT TO TJU.  BUT THERE IS STILL NO

9    CONNECTION BETWEEN A TRADE SECRET, A CHARGED TRADE SECRET AND

10   THAT BENEFIT.

11        SO THE DEFENDANTS CAN INTEND TO CONFER A BENEFIT ON TJU

12   ALL DAY LONG, THAT'S NOT CRIMINAL.  THEY CAN PLAN TO GO TO

13   CHINA AND SAY EVERYBODY ELSE HAS GOT ONE OF THESE AND YOU

14   SHOULD REALLY GET ONE AND IT WOULD BE GREAT FOR YOU AND WE WILL

15   HELP YOU BUILD IT.

16        BUT UNLESS THE GOVERNMENT CAN PROVE THAT THEY ARE TAKING A

17   SPECIFIC TRADE SECRET FROM AVAGO OR SKYWORKS AND THEY ARE USING

18   THAT TO BUILD A MEMS LAB OR OTHERWISE BENEFIT, THEN THERE IS NO

19   ECONOMIC ESPIONAGE.

20        AGAIN, THERE MIGHT BE A CRIME, AND A SERIOUS CRIME, THEFT

21   OF TRADE SECRETS IS A SERIOUS CRIME.  BUT WITHOUT THAT ADDED

22   ELEMENT OF THE CONNECTION BETWEEN THE CHARGED TRADE SECRET AND

23   THE BENEFIT, THERE IS NO ECONOMIC ESPIONAGE.

24              THE COURT:  OKAY.  WELL, I WILL ASK MS. KANE IF SHE

25   CONCEDES THAT POINT IN JUST A MOMENT.

1          MR. GUGELMANN:  I DOUBT SHE WILL.

2          SO THE OTHER LINK THAT THE GOVERNMENT DRAWS HERE, AT LEAST

3     ARGUABLY I THINK, BETWEEN ANY OF THE TRADE SECRETS AND TJU, IS

4     THIS STATEMENT THAT A TJU GRAD STUDENT HAD SOME OF THESE

5     DOCUMENTS IN HIS E-MAIL.

6          THIS PERSON IS MR. ZHOU, Z-H-O-U, WHO IS A CODEFENDANT IN

7     THE CASE.  JUST AS AN INITIAL MATTER, I DON'T THINK THE

8     GOVERNMENT HAS PROVED HE IS A TJU GRAD STUDENT, I DON'T KNOW

9     WHERE THE EVIDENCE OF THAT IS.  BUT LET'S ASSUME THAT'S TRUE

10    AND LET'S ASSUME THERE'S A SINGLE TJU GRAD STUDENT WHOSE GOT

11    SOME OF THESE THINGS, DOES THAT ESTABLISH THAT THESE TRADE

12    SECRETS WERE STOLEN OR ACQUIRED OR POSSESSED TO BENEFIT TJU?

13         AGAIN, IT JUST DOESN'T.  AND I THINK IT MIGHT HELP IN

14    CONSIDERING THIS, IF THE COURT THOUGHT ABOUT THIS IN THE

15    CONTEXT OF THE U.S., IF THIS COMPANY WAS IN THE U.S. AND IF A

16    BERKELEY GRAD STUDENT HAD SOME OF THESE DOCUMENTS, WOULD THAT

17    BE PROOF THAT THESE DOCUMENTS WERE STOLEN TO BENEFIT THE STATE

18    OF CALIFORNIA?  WITH NOTHING FURTHER, NO OTHER EVIDENCE OTHER

19    THAN, THIS GUY'S GOT A COUPLE OF THESE DOCUMENTS.

20         THAT'S NOT PROOF BEYOND A REASONABLE DOUBT THAT THEY WERE

21    BEING USED TO BENEFIT TJU.  WE CAN MAKE ALL SORTS OF GUESSES

22    ABOUT WHY THAT GUY MIGHT HAVE HAD THEM.  WE CAN MAKE

23    ASSUMPTIONS AND SAY IT'S ONLY LOGICAL THAT IT WOULD HAVE HAD TO

24    HAVE BENEFITTED THE UNIVERSITY BECAUSE HE'S A GRAD STUDENT, BUT

25    THAT'S NOT ACTUALLY EVIDENCE OF A BENEFIT TO TJU.

```
1        SO THOSE TWO, THE PATENT APPLICATIONS AND THE POSSESSION

2   BY A GRAD STUDENT ARE THE TWO THINGS THAT THE GOVERNMENT POINTS

3   TO TO TRY TO TIE A SPECIFIC TRADE SECRET, WHICH IS WHAT THEY

4   HAVE TO DO, TO A BENEFIT TO TJU.  AND I THINK THEY FALL SHORT

5   ON BOTH OF THOSE.

6        THE COURT:  OKAY.  I THINK IT'S EXHIBIT 22, PAGE 3,

7   SOMETHING LIKE THAT, THAT EVIDENCES THAT YOUR CLIENT AND A

8   COLLEAGUE, ONE OF HIS COLLEAGUES WERE GOING TO BE RESPONSIBLE

9   FOR PROVIDING THE INTELLECTUAL PROPERTY, IF YOU WILL, PART OF

10  THE PROJECT.  AND PUTTING THAT TOGETHER, DOES THAT ESTABLISH A

11  TRAIL, A PATH, A TRAIL OF SOME SORT THAT YOU CAN FOLLOW TO THE

12  TRADE SECRET TO TJU?

13       MR. GUGELMANN:  WELL, NO, BECAUSE EXHIBIT 22 IS ABOUT

14  ROFS RATHER THAN THE TJU MEMS LAB.

15       SO DR. ZHANG AND OTHER DEFENDANTS WERE SORT OF IN CHARGE

16  OF THE TECHNOLOGICAL SIDE OF ROFS, DOESN'T TELL US ANYTHING ONE

17  WAY OR THE OTHER ABOUT WHETHER TRADE SECRETS WERE USED TO

18  BENEFIT TJU THROUGH THE MEMS LAB OR ANY OTHER WAY.

19       THE COURT:  DOES THE GOVERNMENT TRY TO ESTABLISH THAT

20  ROFS WAS AN INSTRUMENTALITY ALSO?

21       MR. GUGELMANN:  THE GOVERNMENT DOES.  AND I'M GLAD TO

22  TURN TO THAT NOW.  BECAUSE ROFS JUST ISN'T AN INSTRUMENTALITY.

23  I THINK THEY JUST HAVE NOT PROVED THAT AT ALL.  THE TEST FOR

24  WHETHER SOMETHING IS AN INSTRUMENTALITY IS IT NEEDS TO BE

25  SUBSTANTIALLY OWNED, CONTROLLED, SPONSORED, COMMANDED, MANAGED
```

1    OR DOMINATED BY THE CHINESE GOVERNMENT OR BY THE FOREIGN

2    GOVERNMENT UNDER SECTION 1839.

3        WE DON'T HAVE ANY EVIDENCE OF ANYTHING HERE.  WE HAVE NO

4    EVIDENCE OF CONTROL, NO EVIDENCE AT ALL OF COMMAND, MANAGING OR

5    DOMINATION BY CHINA.  DR. MULVENON WHO TOOK THE STAND TO

6    TESTIFY ABOUT THE RELATIONSHIP, GENERALLY KIND OF THE STRUCTURE

7    OF THE CHINESE GOVERNMENT AND HOW A CHINESE GOVERNMENT

8    INTERACTS WITH CHINESE BUSINESSES, SAID NOTHING ABOUT ANY OF

9    THOSE THINGS.  THERE'S JUST NO EVIDENCE THAT CHINA CONTROLLED,

10   MANAGED, SPONSORED, DOMINATED, ANYTHING.

11       THE ONLY EVIDENCE THAT WE HAVE OF A RELATIONSHIP BETWEEN

12   ROFS AND THE CHINESE GOVERNMENT, IS THIS SIX PERCENT STAKE THAT

13   IS HELD BY -- 5.92 PERCENT STAKE THAT IS HELD BY MNMT, WHICH IS

14   A SUBSIDIARY OF TJU.

15            THE COURT:  IS THAT ENOUGH?

16            MR. GUGELMANN:  NO, THAT'S NOT ENOUGH.

17            THE COURT:  WHY NOT?

18            MR. GUGELMANN:  IF I COULD TABLE THAT FOR ONE SECOND,

19   JUST TO GET TO THE OTHER THING THAT DR. MULVENON SAYS, WHICH IS

20   THAT THERE'S EVIDENCE THAT TJU DICTATED THE STRUCTURE OF ROFS.

21       AND HE POINTS TO EXHIBIT 50 IN SUPPORT OF THAT.  AND I

22   THINK WE SHOWED IN OUR BRIEFS EXHIBIT 50, IF ANYTHING, SAYS THE

23   OPPOSITE.  EXHIBIT 50 SAYS HERE ARE THE THINGS TJU WOULD LIKE

24   TO SEE HAPPEN HERE, NONE OF THOSE THINGS HAPPENED.

25       SO IN TERMS OF CONTROL OF ROFS, THAT DOESN'T CUT IT

1    REALLY, IT'S THE 5.92 PERCENT.

2         5.92 PERCENT OWNERSHIP OF ROFS ISN'T ENOUGH TO SHOW AN

3    INSTRUMENTALITY AT ALL.  WHAT THE LEGISLATURE HAS SAID, AND

4    THERE'S VERY LITTLE CASE LAW ON THIS QUESTION OF WHAT AN

5    INSTRUMENTALITY MEANS, BUT WHAT THE LEGISLATURE HAS SAID, AND

6    THIS WE CITE ON PAGE 8 OF OUR BRIEF, DOCUMENT 322, THE

7    PERTINENT INQUIRY IS WHETHER THE ACTIVITIES OF THE COMPANY ARE

8    FROM A PRACTICAL AND SUBSTANTIVE STANDPOINT, FOREIGN GOVERNMENT

9    DIRECTED.

10        SO WHATEVER THIS SIX PERCENT MEANS, THERE'S NO EVIDENCE

11   THAT IT TRANSLATES INTO THE ACTIVITIES OF THE COMPANY BEING,

12   FROM A PRACTICAL AND SUBSTANTIVE STANDPOINT, FOREIGN GOVERNMENT

13   DIRECTED.  SO IT DOESN'T TURN ROFS INSTRUMENT INTO AN

14   INSTRUMENTALITY.

15        I THINK THE COURT'S QUESTION IS GETTING AT WHETHER THE SIX

16   PERCENT STAKE DEMONSTRATES MAYBE SUFFICIENT INSTRUMENTALITY

17   INVOLVEMENT IN ROFS TO BE ABLE TO THEN ASSUME THAT THE CHINESE

18   GOVERNMENT IS BENEFITTING IN SOME WAY FROM ROFS'S OPERATIONS.

19        THE ANSWER TO THAT IS ALSO NO.  AND THAT'S BECAUSE, AGAIN,

20   THE GOVERNMENT JUST HASN'T PROVED WHAT THAT SIX PERCENT COULD

21   POSSIBLY MEAN.

22        I THINK THE COURT NEEDS TO THINK BACK ON DR. MULVENON'S

23   TESTIMONY.  THEY PRESENTED HIM AS AN EXPERT ON CHINESE

24   GOVERNMENT ENTITIES TO OPINE ON THE RELATIONSHIP BETWEEN THE

25   CHINESE GOVERNMENT ENTITIES AND THE BUSINESSES AT ISSUE HERE.

1    HE PROVIDED NO EVIDENCE AT ALL ABOUT WHAT THE CHINESE

2    GOVERNMENT'S STAKE IN THE PRIVATE BUSINESS COULD POSSIBLY MEAN.

3         THEY'RE ASKING THE COURT TO ASSUME THAT IT MEANS SOMETHING

4    AND THAT IT MEANS SPECIFICALLY THE TYPE OF BENEFIT THAT

5    SECTION 1831 CONTEMPLATES.

6         THE COURT:  WELL, HE TALKED ABOUT -- HE PROVIDED A

7    LOT OF INFORMATION ABOUT HOW THE CHINESE GOVERNMENT WORKS AND

8    HOW THE CHINESE GOVERNMENT OVERSEES THE UNIVERSITY, THE WORKING

9    ENTERPRISE AREAS AND ALL OF THAT.  AND HE SEEMED TO SUGGEST

10   THAT IT'S A, HOW SHALL I SAY, VERY ORGANIZED WITH ESTABLISHED

11   PROTOCOLS THAT WOULD SUGGEST THAT IT'S A FINE MACHINE THAT

12   OPERATES, THAT EVERY PIECE IS KNOWLEDGEABLE BY DIFFERENT

13   CONNECTIONS ALL THE WAY UP TO THE CENTRAL GOVERNMENT, AND THAT

14   THERE ARE DIFFERENT POSITIONS, GOVERNORS AND PRECINCT CAPTAINS,

15   ET CETERA, THAT OPERATE AT THE BEHEST AND COMMAND OF THE

16   CENTRAL GOVERNMENT.  AND THEY ALL KNOW THEIR POSITIONS, AND

17   THAT WHOEVER THE MASTER PUPPETEER IS, I WILL JUST CALL IT THAT,

18   I DON'T MEAN TO DISPARAGE IT, COULD PULL A STRING, AND THE

19   SPIDER WEB COULD CAUSE SOMEBODY TO ACT IN A CERTAIN WAY.  AND

20   IT'S DESIGNED TO ALL BE UNDER CONTROL THROUGH DIFFERENT

21   INSTRUMENTALITIES.  LAYERED DOWN.

22        MR. GUGELMANN:  I AGREE HE PROVIDED TESTIMONY ALONG

23   THOSE LINES WITH RESPECT TO HOW THE CHINESE GOVERNMENT IS SET

24   UP, BUT HE ALSO TESTIFIED THAT THERE'S TWO DIFFERENT TYPES OF

25   CORPORATIONS IN CHINA.  THERE ARE GOVERNMENT OWNED --

1        GOVERNMENT SPONSORED CORPORATIONS ON THE ONE HAND, AND THERE

2        ARE PRIVATE CORPORATIONS.  ROFS IS A PRIVATE CORPORATION.

3            IF THE COURT LOOKS -- NOT TO READ TOO MUCH INTO COLORS,

4        BUT IF THE COURT LOOKS AT THE CHART THAT DR. MULVENON PROVIDED,

5        HE'S GOT ALL OF THE GOVERNMENT ENTITIES AS BEING GRAY, AND OFF

6        TO THE SIDE IN BRIGHT BLUE, HE'S GOT ROFS AS A PRIVATE ENTITY.

7            SO THE MISSING PIECE HERE IS NOT THE NATURE OF THE

8        RELATIONSHIPS AMONG AND BETWEEN THE LEVELS OF THE CHINESE

9        GOVERNMENT.  THAT'S NOT THE PART THAT'S MISSING HERE.  BECAUSE

10       THAT'S NOT THE PART THAT MATTERS FOR THE ANALYSIS AS TO ROFS.

11           THE MISSING PIECE THAT THE GOVERNMENT JUST DIDN'T PROVIDE

12       IS WHAT IS THE NATURE OF THE RELATIONSHIP OF A PRIVATE COMPANY

13       WITH A VERY SMALL MINORITY STAKE OWNED BY A SUBSIDIARY OF A

14       SUBSIDIARY OF THE CHINESE GOVERNMENT.  THAT'S THE MISSING

15       PIECE.

16           PRESUMABLY, IF THERE WERE EVIDENCE THAT, FOR EXAMPLE, THAT

17       MEANS THE CHINESE GOVERNMENT IS GOING TO GET SIX PERCENT OF THE

18       TAKE FROM ROFS, OR SOME OTHER BENEFIT THAT'S COGNIZABLE UNDER

19       THE STATUTE.  IF THAT EVIDENCE EXISTED, WE WOULD HAVE HEARD IT

20       FROM DR. MULVENON.

21           THE COURT:  SO YOUR POSITION IS THERE HAS TO BE

22       EVIDENCE OF SOME TYPE OF A BENEFIT.  INVESTMENT, STANDING

23       ALONE, IS NOT A BENEFIT.

24           MR. GUGELMANN:  THAT'S EXACTLY RIGHT, YOUR HONOR.

25           AND I WANT TO POINT THE COURT TO SOME OF THE LITIGATION

1      THAT HAS HAPPENED AROUND THIS QUESTION IN THIS DISTRICT AND IN

2      OTHER PLACES, BECAUSE COURTS HAVE STRUGGLED WITH THIS NOTION OF

3      WHAT EXACTLY IS THE BENEFIT.  WHEN WE ARE TALKING ABOUT A

4      COMPANY IN A FOREIGN GOVERNMENT, HOW DO WE KNOW WHETHER THAT'S

5      THE TYPE OF BENEFIT -- SORRY, A COMPANY IN A FOREIGN COUNTRY,

6      HOW DO WE KNOW THAT THAT'S THE TYPE OF BENEFIT THAT THE

7      ECONOMIC ESPIONAGE STATUTE IS TALKING ABOUT.

8          WHAT WE KNOW IS THAT THE LEGISLATIVE HISTORY URGES SOME

9      RESTRAINT IN HOW THIS STATUTE IS APPLIED WITH RESPECT TO

10     CORPORATIONS.  AND WHAT IT SAYS, THIS IS ALSO IN OUR BRIEF AT

11     PAGE 322, PAGE 18, IS THAT THIS SECTION SHOULD NOT APPLY "TO

12     FOREIGN CORPORATIONS WHEN THERE IS NO EVIDENCE OF FOREIGN

13     GOVERNMENT SPONSORED OR COORDINATED INTELLIGENCE ACTIVITY."

14         AND ALTHOUGH I DON'T FINISH, WE CITED THIS CASE TO THE

15     COURT, THE THIRD CIRCUIT IN HSU, 155 F.3D 189, PICKED UP ON

16     THAT LEGISLATIVE HISTORY IN ORDER TO MAKE THE SAME POINT, THAT

17     THE STATUTE IS DESIGNED TO APPLY ONLY WHEN THERE IS EVIDENCE OF

18     FOREIGN GOVERNMENT SPONSORED OR COORDINATED INTELLIGENCE

19     ACTIVITY.

20         THE OTHER THING THE COURTS HAVE TRIED TO FIGURE OUT IN

21     ADDITION TO SORT OF LOOKING AT THE STATUTE IN TRYING TO FIGURE

22     OUT WHAT IS IT TARGETING, IS WHAT DOES THIS TERM "BENEFIT" MEAN

23     IN THIS CONTEXT BECAUSE IT COULD MEAN ANYTHING, IT COULD BE

24     NOTHING.

25         AND IN THIS DISTRICT, JUDGE WARE IN THE LAN LEE CASE,

1    WROTE THAT THE BENEFIT THAT WE ARE LOOKING FOR HERE HAS TO BE

2    SOMETHING OTHER THAN JUST THE INCIDENTAL BENEFIT THAT A COUNTRY

3    IS GOING TO REALIZE IF YOU OPERATE A COMPANY THERE.

4         SO PRESUMABLY THAT'S TAX, THAT'S KIND OF GENERAL

5    IMPROVEMENT OF THE ECONOMIC SITUATION.  THE BENEFITS THAT JUST

6    FLOW TO A COUNTRY FROM OPERATING A CORPORATION THERE, ARE NOT

7    THE BENEFITS THAT THIS STATUTE IS TALKING ABOUT, THERE'S GOT TO

8    BE SOMETHING MORE SPECIFIC.  NOW PRESUMABLY WHAT THAT IS, IS

9    GOING TO VARY FROM CASE TO CASE.

10        I CAN TELL YOU IN THE LEE CASE, THE ISSUE WAS GOVERNMENT

11   SPONSORSHIP, GOVERNMENT FUNDING OF A BUSINESS THAT THE U.S.

12   GOVERNMENT ALLEGED WAS BUILT ON TRADE SECRETS.  AND SO THE

13   QUESTION WAS, IF YOU STEAL TRADE SECRETS AND YOU TAKE THEM TO

14   CHINA, YOU SET UP A BUSINESS, IF YOU SEEK GOVERNMENT FUNDING

15   FOR THAT BUSINESS, DOES THAT ESTABLISH A BENEFIT TO THE CHINESE

16   GOVERNMENT IN THE WAY THE STATUTE CONTEMPLATES?  AND JUDGE WARE

17   SAID NO, IT DOESN'T, YOU NEED SOMETHING MORE THAN JUST, WE GOT

18   A CORPORATION IN A COUNTRY, THE COUNTRY WILL BENEFIT.

19        SO I THINK KEEPING THAT IN MIND, THE COURT NEEDS TO LOOK

20   AT WHAT PROOF WAS PROVIDED ABOUT THE RELATIONSHIP BETWEEN ROFS,

21   A PRIVATE COMPANY IN CHINA, AND THE CHINESE GOVERNMENT.  AND

22   WHAT PROOF WAS PROVIDED ABOUT A SPECIFIC BENEFIT THAT THE

23   CHINESE GOVERNMENT WOULD REALIZE FROM ROFS.

24        AND FOR PURPOSES OF THINKING ABOUT THAT, AGAIN, THE COURT

25   COULD ASSUME, MAYBE IT NEEDS TO ASSUME FOR THE PURPOSE OF THE

1    THOUGHT EXERCISE, THAT ROFS IS BUILT ON STOLEN TRADE SECRETS,

2    THAT ROFS IS PROOF OF THEFT OF TRADE SECRETS.  BUT THERE'S MORE

3    THAT'S REQUIRED.  AND THE ONLY THING THAT THE GOVERNMENT HAS

4    SAID IS WE'VE GOT A SUBSIDIARY OF TJU THAT HAS A SMALL

5    OWNERSHIP STAKE IN THE COMPANY.

6         NO EVIDENCE AT ALL ABOUT WHAT THAT MEANS.  A LOT OF

7    EVIDENCE ABOUT HOW CHINA IS STRUCTURED DIFFERENTLY THAN THE

8    U.S., THINGS OPERATE DIFFERENTLY.  YOU DON'T HAVE THE SAME --

9    YOU CAN'T MAKE ASSUMPTIONS ABOUT HOW THINGS WORK THERE BASED

10   UPON HOW THE COUNTERPARTS HERE IN THE U.S. WORK.  BUT

11   ABSOLUTELY NO EVIDENCE OF WHAT THAT SIX PERCENT STAKE MEANS AND

12   WHETHER IT CONFERS THE TYPE OF BUSINESS THAT SECTION 1831 --

13   SORRY, THE TYPE OF BENEFIT THAT SECTION 1831 IS TALKING ABOUT.

14        SO THE GOVERNMENT, IN ITS BRIEF, SORT OF CRITICIZES THE

15   DEFENSE AND SAYS, YOU ARE TAKING LITTLE PIECES OF EVIDENCE AND

16   SAYING JUST LOOK AT THIS.  AND REALLY, WE GOT TO BE LOOKING AT

17   THE WHOLE THING.

18        AND THE GOVERNMENT IS RIGHT, WE ARE DOING THAT IN PART

19   BECAUSE WHAT THE COURT IS REQUIRED TO DO, IS LOOK AT THE LITTLE

20   BITS OF EVIDENCE IN THE CONTEXT OF THE WHOLE PICTURE.  BUT TO

21   SEE WHETHER THOSE SPECIFIC ELEMENTS HAVE BEEN MET, WHETHER

22   THERE IS EVIDENCE SPECIFICALLY THAT DR. ZHANG, ON THE TRADE

23   SECRET SIDE, KNEW THESE THINGS WERE TRADE SECRETS AND INTENDED

24   TO INJURE THE OWNERS, AND ON THE ECONOMIC ESPIONAGE SIDE,

25   WHETHER THERE IS EVIDENCE OF A SPECIFIC BENEFIT TO TJU, THROUGH

```
1       THE USE OF THESE TRADE SECRETS, AND/OR TO MNMT THROUGH ROFS.

2            AND ON EACH OF THOSE POINTS, THE GOVERNMENT IS ASKING THE

3    COURT TO ASSUME A LOT, BUT IT HASN'T ACTUALLY PROVIDED EVIDENCE

4    OF THAT BENEFIT.

5            THE COURT:  OKAY.

6            MR. GUGELMANN:  THANK YOU.

7            THE COURT:  THANK YOU VERY MUCH.

8       MR. SWANSON, DO YOU WISH TO ADD ANYTHING?

9            MR. OLMOS:  NOT A WORD, YOUR HONOR.

10           THE COURT:  MR. OLMOS?

11           MR. OLMOS:  NOT A WORD, YOUR HONOR.

12           THE COURT:  OKAY.  THANK YOU.

13      WOULD YOU LIKE A BREAK?  LET'S DO THAT.  LET'S TAKE A

14   FIVE-MINUTE BREAK AND WE WILL COME BACK.  THANK YOU.

15        (RECESS FROM 11:10 A.M. UNTIL 11:19 A.M.)

16           THE COURT:  ALL RIGHT.  WE ARE BACK ON THE RECORD.

17      ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

18   AND I WILL TURN TO MS. KANE.

19      MS. KANE, DO YOU HAVE AN ARGUMENT?

20           MS. KANE:  WELL, PERHAPS MORE OF A DISCUSSION, AS THE

21   COURT SUGGESTED BEFORE.

22           THE COURT:  OKAY.

23           MS. KANE:  THANK YOU, YOUR HONOR.

24      THIS HAS BEEN A LONG ROAD.  WE HAVE HAD THOUSANDS OF PAGES

25   AND HUNDREDS OF THOUSANDS OF WORDS TO BRING US HERE TO THIS
```

1    CLOSING ARGUMENT.  BUT AS THE COURT HAS SEEN, IN THE END, THIS

2    ALL COMES DOWN TO A VERY SIMPLE STORY.

3         AND THIS IS A STORY THAT UNFOLDED JUST AS THE DEFENDANT

4    AND HIS CODEFENDANTS AND HIS CO-CONSPIRATORS PLANNED, BACK IN

5    2006 AS THEY FINISHED THEIR GRADUATE DEGREES AND THEY BEGAN

6    THEIR EMPLOYMENT, THE DEFENDANT AT SKYWORKS AND WEI PANG AT

7    AVAGO, THEY CAME UP WITH A PLAN TO MOVE AVAGO TO CHINA.  AND I

8    KNOW THE COURT HAS HEARD US SAY THAT MANY TIMES, BUT IT'S

9    SIGNIFICANT BECAUSE THIS WAS THE PLAN ALL ALONG.

10        AND THIS TRIAL, THROUGH ALL THE EVIDENCE, THE DOCUMENTS,

11   THE STIPULATIONS, THE TESTIMONY, HAS SHOWN BEYOND A REASONABLE

12   DOUBT THAT THEY DIDN'T JUST SUCCEED IN MOVING AVAGO TO CHINA,

13   ALTHOUGH THEY DID THAT, BUT THEY MOVED AVAGO FOR CHINA.

14        YES, THEY WANTED TO ENRICH THEMSELVES THROUGH THEIR FBAR

15   COMPANY THAT BECAME KNOWN AS ROFS, THE FBAR COMPANY THAT WAS

16   BASED IN PART ON THE TECHNOLOGY THEY HAD STOLEN.  THAT THEY HAD

17   FOUNDED ROFS WITH CLEAR SUPPORT AND CLEAR SPONSORSHIP FROM TJU.

18        THEY USED THOSE STOLEN TRADE SECRETS TO ENHANCE THEIR

19   REPRESENTATIONS.  THEY USED THEIR RESOURCES, INCLUDING THAT

20   STOLEN TECHNOLOGY, TO BUILD THE MEMS LAB AT TJU.

21        AND WHEN THE COURT EXAMINES THIS EVIDENCE AS A WHOLE, THE

22   COURT WILL SEE THAT THEY COMMITTED BOTH THE THEFT OF TRADE

23   SECRETS AND THE ECONOMIC ESPIONAGE.

24        SO FIRST, TURNING TO THE TRADE SECRETS ISSUES THAT HAVE

25   BEEN RAISED TODAY, JUST TO CLARIFY TO THE EXTENT THAT THERE'S

1    BEEN ANY DISCUSSION OF THE ELEMENTS AND HOW THEY DIFFER BETWEEN

2    THE CONSPIRACY TO COMMIT THEFT OF TRADE SECRETS AND THE, WHAT

3    WE CALL SUBSTANTIVE COUNTS.  AND THE SUPPLY IS ALSO IN THE

4    CONTEXT OF ECONOMIC ESPIONAGE.  THAT THE CONSPIRACY COUNT

5    REQUIRES THAT THE DEFENDANT, AND HIS CO-CONSPIRATORS REASONABLY

6    BELIEVED THAT THESE -- THIS INFORMATION WAS TRADE SECRETS.

7         IT IS POSSIBLE TO FIND A DEFENDANT GUILTY OF TRADE SECRETS

8    THEFT WHEN, IN FACT, THE INFORMATION WASN'T A TRADE SECRET OR

9    HASN'T BEEN PROVED TO BE A TRADE SECRET, ALTHOUGH IN THIS CASE

10   IT WAS.  IT HAS BEEN PROVED, AND THIS INFORMATION WAS TRADE

11   SECRETS.

12        AND FOR THE SUBSTANTIVE COUNTS, IT'S THE DEFENDANT'S

13   KNOWLEDGE.  AND THAT'S THE WAY IT'S PHRASED IN THE ELEMENTS

14   THAT THE PARTIES HAVE AGREED ON, WHICH ARE BASED, AS THE COURT

15   HAS NOTED, ON THE NINTH CIRCUIT INSTRUCTIONS.

16        AND SO JUST TO CLARIFY, THOSE ARE THE TWO THINGS THAT WE

17   ARE LOOKING AT.

18        AS TO THE DEFENDANT'S ARGUMENT THAT SOMEHOW HE DIDN'T KNOW

19   THAT THE MATERIAL AT ISSUE FROM AVAGO WAS TRADE SECRETS, THERE

20   IS PLENTY OF EVIDENCE FOR WHICH THE COURT TO FIND THAT THAT'S

21   NOT TRUE AND THAT HE DID KNOW THAT THE MATERIAL WAS TRADE

22   SECRETS.

23        WE HAVE, FROM THE BEGINNING, THE DEFENDANT AND HIS

24   CO-CONSPIRATORS DISCUSSING THE NEED FOR SECRECY.  WE HAVE, FROM

25   THE BEGINNING, DISCUSSIONS OF PROBLEMS WITH THE IP.

1        AND THERE'S NO EVIDENCE OF ANY OTHER INTELLECTUAL PROPERTY

2    ISSUES HERE, RIGHT.  THERE'S NO DISCUSSION OF TRADEMARKS,

3    THERE'S NO DISCUSSION OF COPYRIGHTS, AND SO WHEN THEY ARE

4    TALKING ABOUT INTELLECTUAL PROPERTY ISSUES, THE ONLY REASONABLE

5    INFERENCE IS THAT THEY ARE TALKING ABOUT THESE TRADE SECRETS.

6        THE DEFENDANT, HIMSELF, WAS SUBJECT TO EXTENSIVE

7    RESTRICTIONS THROUGH HIS EMPLOYMENT AT SKYWORKS.  AND AGAIN,

8    THERE'S NO REASON THAT HE WOULD THINK THAT AVAGO SOMEHOW DID

9    NOT, AS THE LEADER IN THE FIELD, AS THE DOMINANT COMPANY IN

10   FBAR PRODUCTION, THAT AVAGO DIDN'T PROTECT ITS TRADE SECRETS.

11           THE COURT:  I HAD ASKED ABOUT NDA'S, AND IS THERE ANY

12    EVIDENCE ABOUT NDA'S.  I THINK WE KNOW THAT NDA'S ARE COMMON IN

13    THE INDUSTRY, BUT I WAS TRYING TO DISCERN WHETHER OR NOT THERE

14    WAS ANY SPECIFIC OR OTHERWISE EVIDENCE OF NDA'S, AT LEAST

15    INVOLVING THE DEFENDANT HERE.

16           MS. KANE:  THERE IS, YOUR HONOR, AND THAT'S PART OF

17    OUR EVIDENTIARY STIPULATION.

18        AND I WILL DIRECT THE COURT TO EXHIBIT 1, PARAGRAPH 11,

19    SUBPARAGRAPH I.  SKYWORKS EMPLOYEES WERE REQUIRED TO SIGN

20    EMPLOYMENT AGREEMENTS THAT SPECIFIED NDA'S AS CONDITIONS OF

21    EMPLOYMENT.

22           THE COURT:  OKAY.

23           MS. KANE:  THESE AGREEMENTS ALSO STATED THAT

24    INVENTIONS AND TECHNOLOGY BELONGED TO SKYWORKS AND THAT

25    EMPLOYEES COULD NOT DISCLOSE INFORMATION PERTAINING TO SKYWORKS

1 INVENTIONS OR TECHNOLOGY.

2   THE COURT:  ABSENT PERMISSION MORE.

3   MS. KANE:  WELL, PRESUMABLY ABSENT PERMISSION, BUT

4 THE EVIDENCE, IN FACT, AT THIS TRIAL IS JUST THAT.

5  AND SO THAT ACTUALLY -- THE COURT'S QUESTION BRINGS ME TO

6 THE NEXT ISSUE WHICH IS THE SKYWORKS TRADE SECRETS.

7   THE COURT:  BEFORE YOU GO THERE, THERE'S NO EVIDENCE

8 HERE THAT THE DEFENDANT SECURED OR HAD PERMISSION FROM SKYWORKS

9 OR ANYONE ELSE TO DISCLOSE --

10   MS. KANE:  NONE WHATSOEVER.

11   THE COURT:  -- TRADE SECRETS.

12  OKAY.  THANK YOU.

13   MS. KANE:  AND I'M SORRY, YOUR HONOR, I APOLOGIZE, I

14 JUMPED AHEAD.

15  BACK TO THE AVAGO TRADE SECRETS.  AS THE COURT HAS SEEN,

16 THE DEFENDANT HIMSELF, DURING HIS INTERVIEW WITH THE FBI,

17 AGREED ON MULTIPLE OCCASIONS THAT INFORMATION WAS IN FACT AVAGO

18 TRADE SECRETS.

19  AND THEN AS TO SKYWORKS AND THIS ARGUMENT THAT THE

20 DEFENDANT SOMEHOW COULDN'T KNOW THAT THESE WERE SKYWORKS'S

21 TRADE SECRETS BECAUSE SKYWORKS HAD EXITED, AT ONE POINT, THE

22 BUSINESS, THERE'S JUST NO SUPPORT IN THE RECORD FOR THAT

23 CONCLUSION.

24  THE DEFENSE HAS SAID THAT AS FAR AS THE DEFENDANT WAS

25 CONCERNED, NO ONE NEEDED THESE ANYMORE.  THAT'S PURE

1    SPECULATION.  THERE'S NO EVIDENCE OF THAT MENTAL STATE.

2    THERE'S NO STATEMENT BY THE DEFENDANT TO THAT, NOTHING

3    WHATSOEVER.

4         THE COURT:  YOU HEARD MY COLLOQUY WITH YOUR COLLEAGUE

5    ABOUT, WELL, IF SOMEBODY EXITS THE MARKET, IS THAT PROPHYLACTIC

6    THEN FOR THE TRADE SECRET ASPECT OF THE CASE?  YOU HEARD HIS

7    ANSWER, DO YOU AGREE WITH HIM?

8         MS. KANE:  YOUR HONOR, THE DEFENDANT HIMSELF AGREED

9    DURING HIS FBI INTERVIEW THAT THIS INFORMATION REMAINED

10   SKYWORKS'S TRADE SECRETS OR REMAINED SKY WORK'S PROPERTY.

11        THERE'S A STIPULATION, IN FACT, THAT NOTES THAT SKYWORKS

12   SOLD UNPUBLISHED PATENT APPLICATIONS.  SO THERE'S NO EVIDENCE

13   THAT SKYWORKS DIDN'T CARE, AND THERE'S NO EVIDENCE THAT THE

14   DEFENDANT HAD ANY REASONABLE BELIEF THAT SKYWORKS DIDN'T CARE.

15        THERE'S PLENTY OF EVIDENCE THAT SKYWORKS DID CARE, HE WAS

16   STILL SUBJECT TO AN NDA.  THERE'S NO EVIDENCE THAT THAT NDA

17   RELEASED HIM IN ANY WAY.  AND SO THERE'S EVIDENCE THAT HE

18   REMAINED UNDER THOSE RESTRICTIONS, THAT THESE REMAINED

19   PROTECTED AS TRADE SECRETS AND THAT HE KNEW THAT.

20        I WILL TURN NOW TO THE ECONOMIC ESPIONAGE COUNTS, UNLESS

21   THE COURT HAS ANY FURTHER QUESTIONS LIMITED TO THE ISSUES OF

22   TRADE SECRETS AT THIS POINT.

23        THE COURT:  NO, NO, I DON'T.  I THINK THAT'S THE PART

24   OF THE CONVERSATION THAT WOULD BE VERY HELPFUL, GIVEN WHAT I'VE

25   HEARD THIS MORNING.

1          MS. KANE:  THANK YOU, YOUR HONOR.

2          AGAIN, I WANTED TO START BY CLARIFYING THE ELEMENTS THAT

3     ARE AT ISSUE HERE.  AT ONE POINT, I THINK THE DEFENSE PHRASED

4     IT AS THE GOVERNMENT MUST SHOW THAT THE DEFENDANT STOLE,

5     POSSESSED, TRANSMITTED OR TOOK SOME ACTION IN ORDER TO BENEFIT

6     AN INSTRUMENTALITY OF A FOREIGN GOVERNMENT.

7          AND THERE ARE TWO SEPARATE ELEMENTS.  AND THE COURT SHOULD

8     ANALYZE THE EVIDENCE IN THE CONTEXT OF THE ELEMENTS AS THEY ARE

9     LAID OUT BY THE NINTH CIRCUIT AND AS THE PARTIES HAVE AGREED.

10         AND THAT IS, THERE IS AN ELEMENT THAT SAID THE DEFENDANT

11    INTENDED OR KNEW THAT HIS ACTIONS WOULD BENEFIT AN

12    INSTRUMENTALITY OF A FOREIGN GOVERNMENT.  AND THAT THE

13    DEFENDANT MISAPPROPRIATED TRADE SECRETS IN ONE OF MANY

14    DIFFERENT WAYS.

15         THE PHRASE IN ORDER TO, DOESN'T APPEAR IN THE ELEMENTS.

16    AND TO THE EXTENT THAT CONFUSES THE ISSUES, I JUST WANTED TO

17    CLARIFY WHERE THAT FALLS.

18         NOW THERE WAS A LOT OF DISCUSSION ABOUT TJU'S MEMS LAB AND

19    ROFS.  THE COMPANY THAT DEFENDANT AND HIS CO-CONSPIRATORS

20    STARTED.  AND DEFENSE HAS ARGUED THAT THESE ARE TWO SEPARATE

21    ENTITIES AND SUGGESTED THAT EVIDENCE AS TO ONE DOESN'T AFFECT

22    THE COURT'S CONCLUSION AS TO ACTIONS WITH REGARD TO THE OTHER.

23         AND IN FACT, THE EVIDENCE SHOWS THAT THESE, WHILE THEY MAY

24    HAVE BEEN TWO ENTITIES, WERE INTERLINKED.  THE DEFENDANT,

25    HIMSELF, DISCUSSED WITH THE FBI HOW THE MEMS LAB WOULD CONDUCT

1     RESEARCH AND THE FBAR COMPANY, ROFS, WOULD BE DAMAGED IN THE

2     COMMERCIAL PRODUCTION.  THAT'S PART OF THE STIPULATION AS WELL.

3          SO AGAIN, I WOULD DIRECT THE COURT TO PARAGRAPH 14 OF

4     EXHIBIT 1.  WHICH SAYS THAT "WEI PANG AND HAO ZHANG BECAME

5     PROFESSORS AT TJU.  AS PROFESSORS, THEY WORKED WITH TJU TO

6     ESTABLISH A MEMS RESEARCH FACILITY AT THE UNIVERSITY.  THEY

7     USED THAT RESEARCH FACILITY TO, AMONG OTHER RESEARCH PROJECTS,

8     DESIGN AND MAKE FBAR FILTER PROTOTYPES WHICH COULD LATER BE

9     COMMERCIALIZED THROUGH THEIR NEW BUSINESS."

10         IN ADDITION, THE 2011 FUNDING APPLICATION DISCUSSES WHAT

11    IT CALLS THE CLOSE UNIVERSITY COLLABORATION RELATIONSHIP

12    BETWEEN ROFS, THE MEMS LAB, AND TJU.

13         SO THESE ENTITIES ARE NOT, THERE'S NO BRIGHT LINE, THERE'S

14    NO WALL BETWEEN THEM.

15              THE COURT:  SO I UNDERSTAND THAT LANGUAGE SUGGESTS A

16     FAMILIARITY AND THE DEFENSE MIGHT SAY, WELL, THAT'S PUFFING,

17     THAT'S WHAT BUSINESSES DO, WE WELCOME THE OPPORTUNITY TO WORK

18     WITH, WE LOOK FORWARD TO COLLABORATION WITH, AND ET CETERA,

19     ET CETERA.  AND THOSE MIGHT JUST BE BUSINESS PUFFING WITHOUT

20     ANY MORE SPECIFICS THAT THE DEFENSE SUGGESTS IS REQUIRED.

21         THERE'S A FAILURE OF NEXUS, ACCORDING TO YOUR COLLEAGUE

22    OPPOSITE.  AND I OF COURSE ASKED, WELL, IT SOUNDS LIKE THE

23    DEFENSE OPINION IS THAT THE GOVERNMENT'S CASE IS BUILT ON

24    CIRCUMSTANTIAL EVIDENCE, WHICH WE ALL KNOW THAT'S SUFFICIENT,

25    BUT HE SAYS THERE'S NOT A NEXUS.

 1          CAN YOU TELL ME ABOUT THAT, MAYBE?  MAYBE THIS IS THE TIME

 2    TO TALK ABOUT THAT.

 3               MS. KANE:  YES, YOUR HONOR.

 4          SO FIRST, AS THE COURT HAS OBSERVED, CIRCUMSTANTIAL

 5    EVIDENCE IS JUST EVIDENCE.  AND THE COURT CAN AND SHOULD MAKE

 6    INFERENCES BASED ON THAT CIRCUMSTANTIAL EVIDENCE.  BUT HERE,

 7    THE SUGGESTION THAT THAT MIGHT BE JUST SORT OF ADVERTISING COPY

 8    OR PUFFERY, FIRST OFF, THIS IS THE EVIDENCE WE HAVE IN THIS

 9    CASE, AND THERE'S NO INDICATION OF ANYONE WHO INTERPRETED THIS

10    AS PUFFERY.

11          THIS PARTICULAR DOCUMENT I WAS DISCUSSING THE 2011

12    APPLICATION FOR FUNDING, IS A FORMAL APPLICATION THAT THE

13    DEFENDANTS WERE SUBMITTING TO TEDA, THE TIANJIN ECONOMIC

14    DEVELOPMENT AREA.

15          SO THIS IS NOT SOME OFF HAND COMMENT.  AND THAT DOCUMENT

16    DOES HAVE SPECIFICS.  AS THE COURT NOTED, THIS ISN'T, WE LOOK

17    FORWARD TO COLLABORATING.  IT STATES, THIS IS THE RELATIONSHIP

18    WE HAVE, WE HAVE A CLOSE COLLABORATION RELATIONSHIP.  BUT IT

19    ALSO TALKS SPECIFICALLY ABOUT THE SUPPORT FOR ROFS PROVIDED BY

20    THE TIANJIN ECONOMIC TECHNOLOGICAL AND DEVELOPMENT ZONE.  IT

21    TALKS ABOUT THE INVESTMENT IN ROFS.  AND IT MAKES CLEAR THAT

22    ROFS IS COLLABORATING WITH TIANJIN UNIVERSITY TO ESTABLISH THIS

23    HIGH-TECH PROJECT IN THE MICROSYSTEM AREA.

24          SO THIS ISN'T JUST PUFFERY, THIS IS THEIR ACTUAL

25    APPLICATION TO A GOVERNMENT AGENCY FOR FUNDING THAT IS TOUTING

1     THEIR RELATIONSHIP WITH TJU.  MOREOVER, THE PERSONNEL INVOLVED

2     IN ROFS ARE THE DEFENDANT, A PROFESSOR.  WEI PANG, ALSO A

3     PROFESSOR.  JINPING, ANOTHER PROFESSOR, WHO ALSO WORKED FOR AN

4     OFFICE UNDER THE ADMINISTRATIVE EDUCATION IN ADDITION TO HIS

5     PROFESSORSHIP.  SO AS DR. MULVENON TESTIFIED, THE

6     ADMINISTRATIVE EDUCATION IS AN INSTRUMENTALITY OF THE CHINESE

7     GOVERNMENT.

8               THE COURT:  SO WHAT DOES ALL OF THAT SUGGEST THEN,

9     THAT THE COURT SHOULD LOOK TO ROFS AS, IF ANYTHING?

10              MS. KANE:  SO ROFS IS AN INSTRUMENTALITY OF THE

11    CHINESE GOVERNMENT.  THE DEFENSE HAS ARGUED THAT THE SPECIFIC

12    FINANCIAL STAKE THAT MNMT HAD IN ROFS IS NOT TELEVISION TO MAKE

13    IT AN INSTRUMENTALITY OF THE CHINESE GOVERNMENT.

14              THE COURT:  YOU TALK ABOUT SIX PERCENT, IS THAT

15    ENOUGH AND WHAT DOES THAT MEAN, AND THERE'S NO EVIDENCE THAT

16    THEY ARE GOING TO GET SIX PERCENT OF THE PROFITS OR SIX PERCENT

17    OF WHATEVER, IT'S JUST THEY HAVE A SIX PERCENT INTEREST.

18         IS THAT ENOUGH?  IS THAT AN INSTRUMENTALITY?  WHAT DOES

19    THAT SAY?

20              MS. KANE:  WHETHER THAT'S ENOUGH IS REALLY IRRELEVANT

21    BECAUSE THAT'S NOT THE EXTENT OF THE EVIDENCE.

22         THE EVIDENCE IS THAT MNMT, WHICH IS ONE HUNDRED PERCENT

23    OWNED BY TJU, WAS AN INVESTOR.  THE OTHER INVESTORS INCLUDED

24    THE DEFENDANT, A PROFESSOR AT TJU, WEI PANG, A PROFESSOR AT

25    TJU, AND THERE IS TESTIMONY FROM DR. MULVENON, AND THIS IS THE

1    ONLY TESTIMONY ON THIS SUBJECT, THAT WHEN YOU LOOK AT THESE

2    FINANCIAL STAKES, THAT NOT JUST MNMT HAD, BUT OTHER PEOPLE

3    AFFILIATED WITH TJU HAD, AND WHEN YOU LOOK AT THE WAY THAT TJU

4    WAS CONTROLLING THE FORMATION AND THE DEVELOPMENT OF ROFS, THAT

5    ROFS WAS THEREFORE AN INSTRUMENTALITY OF THE CHINESE GOVERNMENT

6    THROUGH ITS RELATIONSHIP WITH TJU.

7             THE COURT:  AND IS THAT BECAUSE, AS YOU JUST SAID, IS

8     THAT BECAUSE TJU WAS OF GREAT ASSISTANCE OR GAVE DIRECTION TO

9     THE CREATION OF ROFS?

10     IF THE COURT FINDS THAT THEY WERE, THAT THEY DID HAVE

11     GREAT DIRECTION, THEY FORMED, THEY TOLD THEM HOW TO PUT IT

12     TOGETHER, BEFORE WE, TJU, ACCEPT IT, IS THAT SUFFICIENT?

13             MS. KANE:  YOUR HONOR, AT EVERY STEP, ONCE THE

14     DEFENDANTS BEGAN WORKING WITH TJU, AT EVERY STEP WE SEE TJU

15     DIRECTING THEM IN THEIR FORMATION OF ROFS.

16     SO WE SEE THEM SAY THINGS LIKE, I'VE MET WITH TJU

17    PERSONNEL AND WE ARE ALLOWED TO FORM OUR OWN COMPANY THAT WILL

18    THEN JOIN THE JOINT VENTURE WITH MNMT.

19     WE SEE OTHER REPORTS OF HOW TJU WOULD BE A DIRECT INVESTOR

20    THROUGH MNMT IN ROFS FOR THE FIRST PHASE OF ITS DEVELOPMENT.

21    AND THAT'S EXHIBIT 26.

22     AND I'M SORRY, THE FIRST ONE I REFERRED TO WAS EXHIBIT 50.

23     WE SEE THEN, EXHIBIT 28, WHICH DISCUSSES IN DETAIL THE

24    RELATIONSHIP BETWEEN TJU AND ROFS.

25             SO THROUGHOUT THIS PROCESS, FROM THE DISCUSSION IN APRIL

1   OF 2009 REGARDING FORMING A JOINT VENTURE, THROUGH THE 2011

2   APPLICATION, WE SEE TJU IN CONTROL.  SO IT'S NOT JUST THAT ONE

3   PIECE, THAT ONE FINANCIAL STAKE, ALTHOUGH THAT'S PART OF IT, WE

4   SEE THE CONTROL, AND THAT IS WHAT MAKES ROFS AN INSTRUMENTALITY

5   OF THE CHINESE GOVERNMENT.

6        BUT STEPPING BACK, THAT'S ROFS, THE DEFENDANT HAS CONCEDED

7   THAT TJU IS AN INSTRUMENTALITY OF THE CHINESE GOVERNMENT.  AND

8   THE EVIDENCE IS OVERWHELMING THAT THE DEFENDANT WAS USING AND

9   INTENDED TO USE AND KNEW THAT HIS ACTIONS WOULD BENEFIT TJU BY

10  USING THESE STOLEN TRADE SECRETS.

11           THE COURT:  AND THAT WAS BY ESTABLISHING THE MEMS LAB

12  AT TJU?

13           MS. KANE:  WE HAVE MULTIPLE WAYS IN WHICH THE

14  DEFENDANT'S ACTIONS WOULD BENEFIT TJU.

15        AND THE FIRST IS THE USE OF STOLEN AVAGO TRADE SECRETS TO

16  OBTAIN PATENTS.  AND THE DEFENSE HAS ARGUED THAT THERE IS NOT A

17  CLEAR CONNECTION BETWEEN THE PATENTS AND THE DEFENDANT'S

18  EMPLOYMENT AT TJU.

19        AND THAT ARGUMENT ASKS THE COURT TO JUST DISREGARD COMMON

20  SENSE.  THE DEFENDANT AND WEI PANG OBTAINED PROFESSORSHIPS AT

21  TJU.  WHEN THEY HAD PATENTS ASSIGNED TO THEM, THAT INCREASED

22  THEIR REPUTATION AND THEIR PRESTIGE.  AND THAT TRANSLATES TO

23  THEIR EMPLOYER TJU.

24        THERE WASN'T A DISCONNECT BETWEEN THESE TWO THINGS, THEY

25  WERE OBTAINING PATENTS ON FBAR-RELATED TECHNOLOGY WHILE WORKING

1     ON THEIR MEMS LAB, WHICH INCLUDES FBARS AT TJU, TEACHING AT TJU

2     AND STARTING A COMPANY WITH TJU.  THE IDEA THAT THEY ARE

3     OBTAINING PATENTS WOULDN'T AFFECT THE REPUTATION OF TJU JUST

4     HAS NO BASIS IN REALITY.

5             THE COURT:  SO I WAS TALKING ABOUT A STATEMENT THE

6     DEFENDANT MADE WHEN HE WAS INTERVIEWED ABOUT RECOGNIZING THE

7     DEARTH AND NONEXISTENCE OF MEMS LABS IN CHINA.  AND HE TALKED

8     ABOUT THEM BEING ELSEWHERE, EXCEPT IN CHINA.

9         AND I'M CURIOUS ABOUT YOUR THOUGHTS ABOUT THE EFFORTS TO

10    CREATE THE MEMS LAB.  IS THAT WHAT YOU ARE SAYING IS AT -- AT

11    TJU, EXCUSE ME.  IS THAT WHAT YOU ARE SAYING IS THE BENEFIT TO

12    TJU THEN?

13            MS. KANE:  THAT IS CERTAINLY ONE OF THEM.

14        I THINK THERE ARE A NUMBER OF WAYS IN WHICH THE

15    DEFENDANT'S ACTIONS COULD BE SEEN AS BENEFITTING TJU.

16        HE, HIMSELF, DISCUSSED, AS THE COURT HAS NOTED, HOW TJU

17    DIDN'T HAVE A MEMS LAB AND WANTED ONE BECAUSE STUDENTS AT TJU

18    COULDN'T STUDY THIS FIELD.  SO CLEARLY THE ESTABLISHMENT OF A

19    MEMS LAB WAS A BENEFIT TO TJU.  THAT IS WITHOUT QUESTION.

20        QUICKLY TO RETURN TO THE ISSUE OF THE PATENTS, I JUST

21    WANTED TO ADDRESS THE IDEA THAT THERE ISN'T A CONNECTION

22    BETWEEN THEIR EMPLOYMENT AT TJU AND THESE PATENTS.

23        SO FIRST OFF, WE SEE WHEN WEI PANG BEGINS WORKING WITH TJU

24    TO DEVELOP THIS PLAN FOR THEM TO GO THERE, BECOME PROFESSORS

25    AND START THEIR FBAR COMPANY AND DEVELOP A MEMS LAB, HE GOES TO

1    CHINA AND GIVES A LECTURE AT TJU.  AND HE MEETS WITH SOMEONE

2    WHILE HE'S THERE.  THAT'S IN JANUARY OF 2008.  IN FEBRUARY OF

3    2008, THAT PERSON E-MAILS HIM WITH A REQUEST FOR INFORMATION

4    REGARDING HIS JOB APPLICATION AT TJU.  THE SAME DAY, WEI PANG

5    RESPONDS WITH UNPUBLISHED AVAGO DRAFT U.S. PATENT APPLICATIONS.

6         SO THE IDEA THAT TJU HAD NOTHING TO CONNECT THEM WITH

7    PATENTS IS NOT BASED ON THE EVIDENCE IN THIS CASE.

8         SO FROM THERE, IT CONTINUES.  THEY DISCUSS PATENT ISSUES.

9    AS THE COURT I THINK RAISED TODAY, THERE WERE DISCUSSIONS OF

10   THE TIMING OF PATENT APPLICATIONS THAT THE DEFENDANTS WOULD

11   MAKE VIS A VI THEIR EMPLOYMENT AT TJU.  AT ONE POINT IT WAS

12   SUGGESTED THAT THEY APPLY FIRST FOR THEIR PATENTS.

13        AND THE DEFENSE HAS SUGGESTED THAT TJU'S -- AND TO BE

14   CLEAR, THAT WAS AT TJU'S DIRECTION.  SO WHETHER OR NOT THAT IS

15   WHAT HAPPENED, IT'S HAPPENING AT TJU'S DIRECTION.

16        BUT IT'S NOT THE ONLY INFERENCE THAT TJU WANTED TO

17   DISTANCE ITSELF -- OR SORRY, THAT TJU DIDN'T WANT TO BE

18   ASSOCIATED WITH THE PATENTS, SO MUCH AS IT'S EQUALLY OR MORE

19   LIKELY THAT TJU KNEW THAT THERE WAS STOLEN INFORMATION IN THESE

20   PATENT APPLICATIONS, AND DIDN'T WANT TO BE DIRECTLY CONNECTED

21   WITH THE PATENT APPLICATIONS.

22        THE COURT DOESN'T NEED TO MAKE A FINDING EITHER WAY ON

23   THAT I'M SIMPLY SAYING THAT THE DEFENDANT'S SUGGESTION OF HOW

24   THAT FACT WOULD BE INTERPRETED IS NOT THE ONLY REASONABLE

25   INFERENCE.

1     BUT REALLY THE KEY THING TO TAKE AWAY FROM THAT IS TJU IS

2     DIRECTING THE DEFENDANTS ON HOW TO APPLY FOR A PATENT.  SO IT'S

3     CLEAR THAT THESE PATENTS ARE IMPORTANT IN SOME WAY TO TJU.  AND

4     IT IS COMMON SENSE THAT PROFESSORS OBTAINING PATENTS IS A

5     BENEFIT TO THEIR INSTITUTION.

6          THE COURT:  SO IS THE GOVERNMENT'S CASE THEN AS TO

7     THE ECONOMIC ESPIONAGE, IS IT, I ASKED THIS EARLIER, IS IT

8     PREDICATED ON THE PATENT APPLICATIONS AND THEN SUBSEQUENT

9     E-MAILS REGARDING TRADE SECRET INFORMATION?  IS THAT THE BULK

10    OF IT?

11         AND I KNOW I HAVE SOME DATES IN DECEMBER OF 2010 AND MARCH

12    OF 2013, IN RE E-MAILS, AS WELL AS VARIOUS E-MAILS IN THE FALL

13    OF 2010.

14         MS. KANE:  YOUR HONOR, THERE ARE A NUMBER OF WAYS IN

15    WHICH, AS I SAID, THAT THE DEFENDANT'S ACTIONS BENEFITTED TJU.

16         THESE PATENT APPLICATIONS ARE ONE OF THEM.  I THINK THE

17    E-MAILS THAT THE COURT IS REFERRING TO ARE E-MAILS REGARDING

18    THE AVAGO FBAR RESONATOR P-CELL FILES THAT WERE GOING BACK AND

19    FORTH.  AND THOSE, AGAIN, ARE ALSO VERY IMPORTANT.

20         FIRST OF ALL, I WOULD NOTE THAT CHONG ZHOU, THE GRADUATE

21    STUDENT AT TJU, THE GOVERNMENT DID PUT THAT INTO EVIDENCE.  AND

22    SPECIAL AGENT WU TESTIFIED ABOUT THAT AT PAGE 43, LINES 13 AND

23    14 OF THE TRANSCRIPT.

24         SO CHONG ZHOU WAS NOT JUST E-MAILING WITH THE DEFENDANT

25    THESE P-CELL FILES, WE SEE THAT THEY ARE REVISING THE P-CELL

1    FILES, MEANING THEY ARE USING IT.

2          SO FOR EXAMPLE, ON MARCH 3RD OF 2013, CHONG ZHOU E-MAILS,

3    A P-CELL THAT SHOWED IN ITS INTERNAL TEXT THAT HE HAD REVISED

4    IT IN NOVEMBER OF 2011.

5          SO WE SEE NOT ONLY THAT THE DEFENDANT AND HIS

6    CO-CONSPIRATORS TOOK THIS AVAGO TRADE SECRET INFORMATION BUT

7    THAT THEY WERE USING IT.

8          AND THAT GOES FOR MULTIPLE E-MAILS THAT OCCURRED

9    THROUGHOUT THAT TIME PERIOD WHERE THEY ARE SENDING BACK AND

10   FORTH THESE P-CELLS, SHOWING THAT THEY WERE ACTUALLY BEING USED

11   AT TJU.

12         AND IT'S ALSO IMPORTANT TO REMEMBER THAT THE DEFENDANT,

13   THE EVIDENCE IN THIS CASE IS THAT THE DEFENDANT WAS WORKING AS

14   A PROFESSOR AT TJU, THAT HE DEVELOPED A MEMS LAB AT TJU AND

15   THAT HE DEVELOPED AN FBAR BUSINESS WITH TJU.

16         THERE'S NO EVIDENCE HE DID ANYTHING ELSE DURING THIS TIME.

17   SO AN INVITATION TO SPECULATE THAT THE DEFENDANT TOOK TRADE

18   SECRETS OR RECEIVED AVAGO TRADE SECRETS FOR SOME OTHER UNKNOWN

19   PURPOSE, DOESN'T CONNECT WITH THE FACTS IN THIS CASE.  THE

20   TRADE SECRETS WERE DIRECTLY RELEVANT TO THESE THINGS HE WAS

21   DOING AT TJU.  AND THERE'S NO REASON TO INFER THAT HE WAS USING

22   THEM FOR ANYTHING ELSE.

23         AND IF HE WAS TAKING THEM AND RECEIVING THEM AND USING

24   THEM, THEY HAD VALUE, OTHERWISE THERE WOULDN'T HAVE BEEN A NEED

25   IN THE FIRST PLACE FOR ALL THIS SECRECY.

1          AND AS THE COURT ALSO DISCUSSED WITH DEFENSE, WE SEE IN

2     2011 THAT DR. RUBY VISITS THE MEMS LAB AT TJU.  AND DR. RUBY

3     ISN'T JUST SOMEONE THAT WORKED IN THE FBAR BUSINESS, WE SEE IN

4     THE 2011 TADA APPLICATION BY THE DEFENDANT AND HIS

5     CO-CONSPIRATORS, THEY TALK ABOUT HOW WEI PANG WORKED FOR

6     DR. RUBY AND HOW PRESTIGIOUS THAT WAS.  AND DR. RUBY FORMS THE

7     OPINION THAT THIS MEMS LAB IS USING AVAGO TECHNOLOGY.

8               THE COURT:  AND HE CONFRONTED SOMEONE, I THINK.

9               MS. KANE:  HE DID.  HE CONFRONTED WEI PANG.  AND

10     WEI PANG FALSELY DENIED HAVING AN FBAR COMPANY OR ANY COMPANY.

11               THE COURT:  WHAT'S THE SIGNIFICANCE OF THAT FACT?

12               MS. KANE:  YOUR HONOR, THAT SHOWS HIS CONSCIOUSNESS

13     OF GUILT.  IT'S UNDISPUTED THAT WEI PANG AND THE DEFENDANT HAD

14     STARTED AN FBAR FABRICATION COMPANY AT THAT POINT.

15          THE ONLY REASON HE WOULD LIE TO HIS FORMER BOSS ABOUT THAT

16     IS IF HE KNEW THAT THEY WERE USING STOLEN AVAGO TECHNOLOGY FOR

17     THEIR FBAR COMPANY AND HE DIDN'T WANT ANYONE TO EXAMINE THAT.

18     OTHERWISE, WOULDN'T HE BE PROUD TO TELL HIS FORMER BOSS, I

19     STARTED AN FBAR COMPANY, I'M BRINGING FABRICATION TO CHINA.

20          THEY TALKED ABOUT IN THEIR FUNDING APPLICATION ABOUT HOW

21     CHINA LAGGED BEHIND THE REST OF THE WORLD AND BEHIND AVAGO

22     SPECIFICALLY IN THIS FIELD.  SO FOR HIM TO HIDE HIS

23     ACCOMPLISHMENT CAN ONLY MEAN ONE THING.

24          SO WHEN THE COURT LOOKS AT ALL THE EVIDENCE TOGETHER IN

25     THE CONTEXT OF THE ELEMENTS THAT THE PARTIES HAVE AGREED ON,

1    THE DOCUMENTS, THE STIPULATED FACTS, THE TESTIMONY, WE ARE

2    CONFIDENT THAT THE COURT WILL RETURN A VERDICT OF GUILTY ON ALL

3    COUNTS.

4         THE COURT:  THANK YOU.

5         MS. KANE:  AND I APOLOGIZE, I WANTED TO ADD IF THE

6    COURT HAS ANY FURTHER QUESTIONS, I'M HAPPY TO ADDRESS ANYTHING

7    ELSE.

8         THE COURT:  WELL, THANK YOU.

9         I WANTED TO, AS I SHOULD HAVE DONE AT THE OUTSET, INDICATE

10   THAT -- I'M TRYING TO FIND YOUR SUBMISSION, I'M SORRY, BUT YOU

11   HAVE DISMISSED CERTAIN COUNTS.

12        MS. KANE:  THAT IS CORRECT, YOUR HONOR.

13        AND THE DEFENDANT ALSO WAS NOT CHARGED ORIGINALLY IN EVERY

14   COUNT OF THE INDICTMENT.

15        THE COURT:  AND I THINK IT WAS DOCUMENT 319, 319, YOU

16   DISMISSED COUNTS 6, 16, 21 AND 31 OF THE SUPERSEDING

17   INDICTMENT.  AND THOSE COUNTS ARE NO LONGER BEFORE THE COURT.

18        MS. KANE:  YES, YOUR HONOR.

19        AND THE DEFENDANT IS NOT CHARGED IN COUNTS 32, AND THE

20   CORRESPONDING TRADE SECRET COUNT, 17.

21        THE COURT:  AND 17 AS WELL?

22        MS. KANE:  YES, YOUR HONOR.

23        THE COURT:  DO YOU AGREE -- DEFENSE AGREES WITH THAT?

24        MR. GUGELMANN:  YES, YOUR HONOR.

25        THE COURT:  ALL RIGHT.  THANK YOU.

1       LET'S SEE, I HAD A COUPLE OF QUESTIONS THAT MAY NOT BE AS

2    IMPORTANT, BUT ONE OF THE THINGS I WAS CONCERNED, AND I WILL

3    INVITE DEFENSE COUNSEL TO COME UP AS WELL, YOU BOTH CAN STAND,

4    I JUST HAD A COUPLE OF QUESTIONS.

5       I DON'T THINK THIS IS AN ISSUE HERE, BUT I MADE A NOTE TO

6    MYSELF THAT WHETHER OR NOT THE DEFENDANT WAS ARGUING THAT THE

7    TRADE SECRET, THAT HE TOOK A TRADE SECRET OUT OF IGNORANCE,

8    MISTAKE OR LACK OF KNOWLEDGE, IS THAT A DEFENSE THAT YOU'RE

9    ADVANCING HERE?

10          MR. GUGELMANN:  WE ARE NOT ADVANCING A DEFENSE THAT

11    THE POSSESSION WAS ACCIDENTAL, FOR EXAMPLE.

12       I THINK WE HAVE STIPULATED THERE WERE E-MAILS GOING BACK

13    AND FORTH BETWEEN THE PARTIES.  WE ARE NOT ARGUING WITH THE

14    COURT THAT THEY WERE SENT IN ERROR.

15          THE COURT:  OKAY.

16          MR. GUGELMANN:  ON THE TRADE SECRET COUNT, WE ARE

17    ADVANCING THE ARGUMENT WITH RESPECT TO THE KNOWLEDGE THAT THE

18    DOCUMENTS WERE A TRADE SECRET.  BUT I THINK THAT'S A DIFFERENT

19    QUESTION THE COURT IS ASKING.

20          THE COURT:  RIGHT.

21       AND JUST SO I CAN GET THE TIME STAMP ON THE ALLEGATIONS OF

22    THE CONSPIRACY AND ITS BEGINNING, I THINK THE GOVERNMENT'S

23    ALLEGATION IS THAT IT BEGAN NOVEMBER 2006?

24          MS. KANE:  LET ME JUST CONFIRM THAT, YOUR HONOR.

25          THE FIRST OVERT ACT ALLEGED IS OCTOBER 2006.

```
1              THE COURT:  THANK YOU.

2         ALL RIGHT.  WE CAN DO POINT COUNTERPOINT FOR A MOMENT HERE

3    WHILE I HAVE YOU BOTH HERE.  I WAS GOING TO SAY, AND I STILL

4    WILL SAY, IT'S NOT ENOUGH THAT WE'VE HAD ALL THESE

5    CONVERSATIONS AND I'VE READ YOUR BRIEFING, IF YOU FEEL YOU NEED

6    TO, I WOULD PERMIT FIVE PAGES, NO MORE, IF YOU WANTED -- I'M

7    NOT INVITING THAT, AND MAYBE WE WON'T NEED IT AFTER THIS, BUT

8    YOU'VE HEARD MS. KANE TALK ABOUT THE ROFS ISSUE, AND SHE

9    SUGGESTS THAT IF THE COURT LOOKS AT ALL OF THE EVIDENCE, THE

10   COURT WOULD FIND THAT HE DIDN'T USE THESE WORDS, BUT THAT ROFS

11   AND THE GENESIS OF ROFS AND ITS RELATIONSHIP WITH THE MEMS LAB

12   IS INEXTRICABLY INTERTWINED BECAUSE THEY ALL GO TOWARDS THE

13   SAME GOAL OF YOUR CLIENT SEEKING A JOB, A PROFESSORSHIP AT THE

14   UNIVERSITY; AND ALONG WITH THAT, THE VALUE ADDED OF HAVING HE

15   AND HIS COLLEAGUE WOULD BE THE MEMS LAB, THE TECHNOLOGY THAT

16   THEY WERE, THAT HE SPECIFICALLY, YOUR CLIENT, WAS RESPONSIBLE

17   FOR, AND EXPECTED TO BRING, AND THAT OF COURSE HE WOULD BE

18   BENEFITTED BUT TJU WOULD BENEFIT ALSO FROM THE EXISTENCE OF

19   THAT LAB FOR A VARIETY OF REASONS.

20        DO YOU WANT TO RESPOND TO THAT?

21              MR. GUGELMANN:  YES.  THANK YOU.

22        SO AS WE DISCUSSED BEFORE, THE DEFENSE IS NOT DISPUTING AT

23   ALL THAT THE MEMS LAB IS A BENEFIT TO TJU.  THERE'S NO QUESTION

24   THERE.

25              AND THE QUESTION THAT THE -- POINT WE ARE MAKING WITH
```

1    RESPECT TO THE MEMS LAB IS THE CONNECTION BETWEEN SPECIFIC

2    TRADE SECRETS AND A BENEFIT TO TJU, WHETHER IT'S THROUGH THE

3    MEMS LAB OR SOMETHING ELSE.

4        I THINK THE GOVERNMENT'S SORT OF PRESENTATION THAT IT JUST

5    MADE ON THE RELATIONSHIP BETWEEN ROFS AND TJU AND THE MEMS LAB

6    WAS PROMPTED I THINK BY THE COURT'S QUESTION ABOUT WHAT'S THE

7    NEXUS.

8        THE NEXUS THAT MATTERS HERE IS NOT THE CONNECTION BETWEEN

9    ROFS AND TJU, NECESSARILY, WE AGREE THERE'S A CONNECTION AND WE

10   STIPULATED THE DEFENDANTS WERE USING THE MEMS LAB TO HELP MAKE

11   DESIGNS THEY COULD COMMERCIALIZE IN ROFS, IT'S NOT THAT THERE'S

12   NO CONNECTION BETWEEN THOSE TWO.

13       THE NEXUS THAT THE GOVERNMENT NEEDS TO DRAW THAT IT HASN'T

14   DRAWN IS THE NEXUS BETWEEN THE TRADE SECRETS -- ON THE TJU

15   SIDE, THE TRADE SECRETS AND THE BENEFIT TO TJU.  ON THE ROTH

16   SIDE, THERE'S ALSO THE QUESTION OF THE NEXUS ON WHAT'S THE

17   BENEFIT TO ROFS THAT FLOWS TO ANY STATEMENTS OF

18   INSTRUMENTALITY.

19       WE DON'T DISPUTE THERE'S A BENEFIT TO ROFS.  ROFS IS A

20   COMPANY THAT'S MAKING MONEY, PRESUMABLY, OR IT INTENDS TO MAKE

21   MONEY, SO THERE'S A BENEFIT THERE.  BUT THE QUESTION IS WHAT IS

22   THE BENEFIT THAT FLOWS THROUGH ROFS TO THE CHINESE STATE?

23       THE FACTS, I THINK THE GOVERNMENT -- THE GOVERNMENT SORT

24    OF RE-RAISES THIS ARGUMENT THAT THE BENEFIT IS PRESUMABLY

25    BECAUSE ROFS IS AN INSTRUMENTALITY.

1        THAT'S JUST NOT PROVEN.  I THINK THE GOVERNMENT SORT OF

2     SAYS OVER AND OVER AGAIN, WE SEE EXAMPLES OF TJU'S CONTROL.

3     BUT THE ONLY EXAMPLE THEY CITE IS EXHIBIT 50 WHERE TJU SAID X,

4     AND ROFS DID Y.

5        SO IN TERMS OF ACTUAL EVIDENCE OF THE STATUTORY DEFINITION

6     OF SUBSTANTIAL OWNERSHIP, SUBSTANTIAL CONTROL, SUBSTANTIAL

7     COMBINATION BY CHINA OF ROFS, THAT DOESN'T EXIST, IT'S NOT

8     THERE, ROFS IS NOT AN INSTRUMENTALITY.

9        THE QUESTION THEN IS WHETHER THERE IS SOME CONNECTION

10    BETWEEN ROFS AND A BENEFIT TO AN INSTRUMENTALITY.  SO THAT'S A

11    DIFFERENT QUESTION THAN THE INSTRUMENTALITY QUESTION.

12       BUT WHEN THE COURT ASKED THE GOVERNMENT ABOUT THE NEXUS

13    AND THE GOVERNMENT RESPONDED WITH SORT OF A LITANY OF

14    CONNECTIONS BETWEEN THE ENTITIES AT ISSUE, THAT'S A DIFFERENT

15    POINT, THAT'S NOT WHERE THE DEFENSE STANDS BECAUSE NONE OF

16    THAT'S CONTESTED AND NONE OF THAT, FRANKLY, MATTERS FOR THE

17    ECONOMIC ESPIONAGE COUNTS.

18            THE COURT:  FOR ECONOMIC ESPIONAGE, IT'S EITHER/OR,

19     IT DOESN'T HAVE TO BE BOTH.  WHAT I'M SAYING IS THE ROFS AND

20     THE MEMS LAB AND OTHERS, IT'S EITHER/OR.

21            MR. GUGELMANN:  IT COULD BE EITHER/OR, BUT AS TO

22     EITHER ONE, IT HAS TO BE BOTH THE INSTRUMENTALITY AND HAVE THE

23     REQUISITE BENEFIT THAT'S CONNECTED TO THE TRADE SECRETS.

24            THE COURT:  AND I THINK YOUR OBJECTION IS, WHAT I

25     HEAR YOU SAYING IS THAT THE ROFS, LET ME PUT THAT ASIDE, BUT AS

1      TO THE TJU, MEMS, WHATEVER, YOU ARE SAYING THERE'S A FAILURE OF

2      PROOF, JUDGE, AS TO A SPECIFIC TRADE SECRET THAT WAS USED THAT

3      WAS THE CONDUIT, HOWEVER YOU WANT TO DESCRIBE IT, THAT WAS USED

4      TO EITHER CREATE THE MEMS LAB OR IN OTHER, SOME OTHER

5      MECHANICAL OR NONMECHANICAL WAY, PROVIDE A BENEFIT TO TJU.

6           MR. GUGELMANN:  THAT'S EXACTLY RIGHT.

7        AND IT'S NOT -- IT'S NOT BECAUSE WE ARE HAIR SPLITTING ON

8      THE EVIDENCE, IT'S BECAUSE THE MEMS LAB IS JUST A DIFFERENT

9      THING THAN AN FBAR FAB FACILITY.

10          THE COURT:  AND DO THEY HAVE TO SHOW A SPECIFIC TRADE

11     SECRET THAT SOMEHOW IS THE GENESIS OF THE MEMS LAB OR SOMEHOW

12     WAS THE SPARK OF THE GESTALT MOMENT, WHATEVER IT IS, I'M SORRY,

13     WHATEVER THAT WAS TO CREATE THE MEMS LAB?

14          MR. GUGELMANN:  WHAT THEY HAVE TO PROVE IS IN SOME

15     WAY THAT THERE WAS A BENEFIT, IT WAS EITHER INTENDED OR KNOWN,

16     THAT CAME THROUGH THE OFFENSE RELATED TO THE TRADE SECRET.

17        AND THE GOVERNMENT DIDN'T LIKE THE WAY I PHRASED IT

18     BEFORE, AND I DON'T REMEMBER EXACTLY WHAT I SAID, BUT THERE HAS

19     TO BE AN OFFENSE THAT RELATES TO A TRADE SECRET, WHETHER IT'S

20     MISAPPROPRIATION, COPYING, USING, AND THAT OFFENSE WITH THAT

21     TRADE SECRET HAS TO BENEFIT THE INSTRUMENTALITY.

22          THE COURT:  OKAY.

23        MS. KANE, WOULD YOU LIKE TO TAKE UP RIGHT WHERE HE LEFT

24     OFF?

25          MS. KANE:  I WILL DO MY BEST, YOUR HONOR.

1        AS I HAD NOTED BEFORE, THERE ARE A NUMBER OF WAYS IN WHICH

2    THE THEFT OF TRADE SECRETS BENEFITTED THE VARIOUS

3    INSTRUMENTALITIES OF THE CHINESE GOVERNMENT THAT WE HAVE

4    DISCUSSED.

5        THE DEFENDANT HIMSELF TOUTED HIS PATENT IN TEMPERATURE

6    COMPENSATION, THAT'S ONE OF THE AVAGO TRADE SECRETS THAT WE SEE

7    LISTED IN THE STIPULATION AT PARAGRAPH 15-HHH THAT AVAGO

8    TEMPERATURE COMPENSATION.

9        IN THEIR 2011 APPLICATION FOR FUNDING FOR ROFS, THEIR

10    APPLICATION FOR GOVERNMENT FUNDING, HE LISTS THAT PATENT AS ONE

11    OF HIS ACCOMPLISHMENTS.

12        SO THAT'S JUST ONE EXAMPLE OF HOW THEIR THEFT OF TRADE

13    SECRETS WAS BEING USED TO BENEFIT AN INSTRUMENTALITY.

14            THE COURT:  SO PUT A BOW ON THAT FOR ME.  HOW DOES

15    THAT -- HE MENTIONED IT, HE SAYS THIS IS WHAT I HAVE, AND

16    MR. GUGELMANN SAYS WELL, OKAY, YOU MENTION IT, YOU SAY IT'S

17    THERE.  BUT HE'S SAYING YEAH, I HAVE A KEY, I HAVE A KEY.  AND

18    OKAY, YOU GOT THE KEY.  BUT THERE'S NOTHING, JUDGE, SAYING HE

19    ACTUALLY PUT THE KEY IN THE LOCK AND OPENED THE DOOR.

20        I THINK THAT'S WHAT -- IT'S A POOR DESCRIPTION, BUT HE

21    WOULD BE FAR MORE ARTICULATE THAN I.

22            MS. KANE:  WELL, YOUR HONOR, THE POINT IS HERE, WHAT

23    WE ARE SAYING IS THAT USING HIS OWNERSHIP OF THAT PATENT, WHICH

24    INCLUDED STOLEN AVAGO TECHNOLOGY, TO BUILD HIMSELF UP AS THE

25    PROJECT LEAD FOR THIS FUNDING APPLICATION, IT WAS A FUNDING

 1        APPLICATION TO A CHINESE GOVERNMENT ENTITY FOR FUNDING.  SO

 2        HE'S SAYING, YOU SHOULD GIVE US THIS MONEY, THAT'S A BENEFIT,

 3        BECAUSE I HAVE THIS PRESTIGIOUS BACKGROUND.

 4               THE COURT:  BECAUSE I WILL BRING THIS.

 5               MS. KANE:  BECAUSE I BRING THIS.

 6        AND HE DOESN'T JUST TALK ABOUT THE PATENTS, HE TALKS ABOUT

 7        THE TIME HE SERVED AS A RESEARCH SCIENTIST IN THE

 8        UNITED STATES.  THEY TALK ABOUT THEIR EXPERIENCE AND AVAGO

 9        SKYWORKS AND ALL THE INFORMATION THAT THEY LEARNED WHILE THEY

10        WERE THERE.

11        AT THE SAME TIME, THEY TALK ABOUT HOW TJU HAS INVESTED IN

12        THE FACILITIES ASSOCIATED WITH -- THAT ARE GOING TO BE USED IN

13        THIS PROJECT FOR WHICH THEY ARE SEEKING FUNDING.  AND A TJU

14        INVESTMENT, AN INVESTMENT IS SOMETHING YOU PUT IN RESOURCES YOU

15        PUT IN MONEY BECAUSE YOU WANT A RETURN.  RETURN IS A BENEFIT.

16               THE COURT:  WHAT'S THE SPECIFIC TRADE SECRET?

17        AMONG THE TRADE SECRETS THAT WE HAVE HERE, MR. GUGELMANN

18        SAYS WELL, THEY HAVEN'T IDENTIFIED THE SPECIFIC TRADE SECRET

19        THAT WAS USED, THAT KEY.  THEY HAVEN'T IDENTIFIED WHERE THAT

20        KEY CAME FROM AND WHETHER OR NOT IT OPENS A DOOR.

21               MS. KANE:  WELL, YOUR HONOR, I'M NOT SURE THE WAY

22        THAT IT'S BEING PRESENTED HERE FITS WITH THE ELEMENTS OF THE

23        OFFENSE, MEANING WE'VE SHOWN THAT THE DEFENDANT MISAPPROPRIATED

24        THESE TRADE SECRETS AND THAT HE INTENDED OR KNEW THAT HIS

25        ACTIONS WOULD BENEFIT TJU.  BUT THERE'S NOT A REQUIREMENT THAT

1    WE BRING HERE, OH, THIS IS ONE OF THE MACHINES FROM ROFS, FROM

2    THE FBAR FABRICATION FACILITY.

3        AND YOU CAN SEE THEY'VE USED THIS PARTICULAR AVAGO TRADE

4    SECRET IN THIS MACHINE TO BUILD THIS TEMPERATURE COMPENSATED

5    WAFER.  WHAT WE'VE SEEN IS THEY ARE USING THE TRADE SECRETS

6    TO -- AND TO BE CLEAR, I'M NOT SAYING THEY DIDN'T DO THAT, I'M

7    SIMPLY SAYING WE DON'T HAVE TO PROVE THAT, WE SIMPLY HAVE TO

8    PROVE THEM USING THE TRADE SECRETS TO BENEFIT AN

9    INSTRUMENTALITY -- OR, I'M SORRY, LET ME MAKE SURE I STATE IT

10   PROPERLY, THAT THEY INTENDED OR KNEW THAT THEIR ACTIONS WOULD

11   BENEFIT AN INSTRUMENTALITY AND THAT THEY HAD MISAPPROPRIATED

12   THESE TRADE SECRETS.  AND THAT'S WHAT WE'VE SHOWN.

13        THE COURT:  AND THE BENEFIT THAT YOU'VE SHOWN IS?

14        MS. KANE:  THE BENEFIT IS -- I'M SORRY.  TO TJU,

15   THERE ARE MULTIPLE BENEFITS, INCLUDING THE BENEFIT OF THE

16   REPUTATION, THE BENEFIT OF BUILDING THE MEMS LAB THAT TJU

17   WANTED.

18        WE SEE -- FOR ROFS, WE SEE THEY ARE BENEFITTING BY

19   ADVERTISING THEIR KNOWLEDGE AND THEIR USE OF THESE TRADE

20   SECRETS TO OBTAIN PATENTS TO THEN OBTAIN FUNDING FROM THE

21   CHINESE GOVERNMENT FOR THEIR ROFS PROJECT.

22        THE COURT:  THIS IS OUR LAST ROUND OF POINT,

23   COUNTERPOINT ON THIS ISSUE.

24        MR. GUGELMANN:  THANK YOU.

25        SO WHAT THE GOVERNMENT IS SAYING IS THE DEFENDANT TOUTED

1    THESE PATENTS IN ORDER TO GETS MONEY FOR ROFS.  FINE.  WE CAN

2    AGREE ON THAT.  THE QUESTION IS WHAT'S THE BENEFIT TO TJU?

3         WE KNOW ROFS IS GETTING A BENEFIT.  ROFS IS A COMPANY IN,

4    ACCEPTING THE GOVERNMENT'S ARGUMENT THAT IT'S BUILT ON TRADE

5    SECRETS FOR THE MOMENT, IT'S GETTING A BENEFIT.  THAT'S FINE.

6    THE QUESTION IS WHAT BENEFIT IS TJU OR SOME OTHER GOVERNMENT

7    INSTRUMENTALITY GETTING.

8         SO BY ROFS SAYING WE HAVE THESE PATENTS, THEREFORE GIVE US

9    MONEY, BENEFIT TO ROFS, SURE.  BUT THAT'S NOT A BENEFIT TO TJU

10   UNLESS THERE'S SOME EVIDENCE OF A CONNECTION BETWEEN THE TWO

11   THROUGH WHICH THAT BENEFIT WOULD FLOW, AND WE DON'T HAVE THAT.

12        THE COURT:  OKAY.  LET ME STOP YOU.

13        THIS IS THE LAST COUNTERPOINT WE WILL ASK MS. KANE TO RISE

14   TO THAT CHALLENGE.  MS. KANE.

15        MS. KANE:  FIRST, TJU HAD AN INVESTMENT IN ROFS

16   THROUGH MNMT.  SO ROTH'S SUCCESS WAS GOING TO BENEFIT MNMT

17   WHICH WAS A PARTNER IN ROFS.  MNMT IS ONE HUNDRED PERCENT TJU.

18   SO THE SUCCESS OF ROFS DIRECTLY BENEFITTED TJU FINANCIALLY.  IT

19   ALSO WOULD HAVE BENEFITTED TJU REPUTATIONALLY.

20        WE'VE SEEN THE DEFENDANT'S OWN DESCRIPTION OF HOW CHINA

21   WAS LAGGING BEHIND IN THIS FIELD.  SO FOR TJU TO NOT ONLY HAVE

22   A MEMS LAB, BUT TO HAVE A COMMERCIALIZED PRODUCT FROM THAT MEMS

23   LAB THAT WAS BEING PRODUCED IN A JOINT VENTURE OF A TJU THAT

24   WOULD LIFT CHINA AHEAD IN THE COMPETITION TO PRODUCE THESE

25   DEVICES, THAT IS ALSO A BENEFIT TO TJU.

1          THE COURT:  OKAY.

2          MS. KANE:  SO THOSE ARE TWO OF THE POSSIBLE WAYS IN

3     WHICH IT BENEFITTED.

4          THE COURT:  ALL RIGHT.  THANK YOU.

5       THE NEXT QUESTION I HAVE IS ABOUT THE SKYWORKS EVIDENCE.

6     AND CHARGES HAVE BEEN DISMISSED REGARDING SKYWORKS.

7          COUNT 6 WAS THE JUNE 10, 2010, PATENT APPLICATION.  CHARGE

8     16 AND 17 -- EXCUSE ME, 16 WAS THE OCTOBER 16, 2011 E-MAIL

9     REGARDING THE SKYWORKS MATERIAL.

10         COUNT 21 WAS A JUNE 10, 2010, PATENT APPLICATION REGARDING

11    SKYWORKS COMPOSITE BAR TECHNOLOGY.  AND COUNT 31 WAS THE

12    OCTOBER 16, 2011 E-MAIL REGARDING SKYWORKS POWERPOINT SINGLE TO

13    BALANCED CIRCUITS.

14         ARE THERE ANY OTHER SKYWORKS -- WELL, THERE ARE OTHER

15    SKYWORKS ACCOUNTS THAT REMAIN.  BUT WHAT IS THE RELATIONSHIP

16    BETWEEN THE DISMISSED COUNTS AND THE REMAINING SKYWORKS COUNTS

17    AND WHETHER OR NOT ANY OF THOSE DISMISSED COUNTS AFFECT OR

18    INFECT THE REMAINING SKYWORKS COUNTS, I GUESS IS MY QUESTION,

19    IF YOU COULD FOLLOW THAT.

20         MS. KANE:  SO THE DISMISSED COUNTS WERE, AS THESE

21     COUNTS ARE SORT OF DISCREET ACTIONS REGARDING DIFFERENCE TRADE

22     SECRETS FOR AVAGO AND FOR SKYWORKS.  SO THE DISMISSED COUNTS

23     DON'T HAVE A RELATIONSHIP TO THE REMAINING SKYWORKS COUNT.

24          THE COURT:  I THINK IT'S COUNT 26 THAT REMAINS.

25          MR. GUGELMANN:  11 ON THE THEFT SIDE AND 26 ON THE

```
1     ECONOMIC ESPIONAGE, YOUR HONOR.

2           THE COURT:  RIGHT.  THOSE ARE THE TWO REMAINING

3     SKYWORKS COUNTS.  OKAY.  THANK YOU.

4        45 SECONDS FOR EACH OF YOU.  ANYTHING FURTHER?

5           MR. GUGELMANN:  YES, YOUR HONOR.

6     I JUST --

7           THE COURT:  WHEN HAS A LAWYER TURNED DOWN TIME TO

8     TALK?

9           MR. GUGELMANN:  IT'S A TERRIBLE QUESTION TO ASK.

10       I JUST WANT TO SORT OF PICK UP WHERE THE GOVERNMENT ENDED,

11    WHICH IS THIS ARGUMENT THAT ROFS'S SUCCESS WOULD DIRECTLY

12    BENEFIT MNMT FINANCIALLY.

13       THERE IS NO EVIDENCE OF ANY OF THAT.  THAT IS WHAT THE

14    GOVERNMENT WOULD LIKE THE COURT TO ASSUME.  THE GOVERNMENT

15    WOULD LIKE TO HAVE THE COURT PLUG IN SOME ASSUMPTIONS TO FILL

16    IN THE EVIDENTIARY GAPS.

17          THE COURT:  WELL, I THINK WHAT SHE SAID WAS, WHY ELSE

18    WOULD THEY BE DOING THIS?  THERE'S NO EVIDENCE THAT THEY ARE

19    DOING THIS BECAUSE OF A PHILANTHROPIC INTEREST.  BUT IS IT

20    EQUAL TO SAY WELL, OF COURSE THEY DO THESE THINGS BECAUSE IT'S

21    COMMON KNOWLEDGE THAT UNIVERSITIES WANT TO CONTINUE THEIR

22    RESEARCH TO ESTABLISH REPUTATIONAL AS WELL AS FINANCIAL GAIN.

23    THAT, COUPLED WITH THE FACT THAT YOUR CLIENT INDICATED THAT

24    THERE WAS A VACUUM IN THIS TECHNOLOGY OR AT LEAST THIS

25    EDUCATIONAL OPPORTUNITY IN CHINA.
```

1          MR. GUGELMANN:  THAT'S ON THE MEMS LAB.

2          THE COURT:  RIGHT.

3          MR. GUGELMANN:  SO IF THERE'S ONE THING I CAN SPEND

4    MY ENTIRE 45 SECONDS ON, IT IS THE DIFFERENCE BETWEEN THE MEMS

5    LAB AND ROFS.  MEMS LAB IS A BENEFIT, WE DON'T DISAGREE WITH

6    THAT AT ALL.  ROFS IS NOT, BECAUSE THEY HAVEN'T PROVED IT.

7          AND WHAT THE ARGUMENT IS, IS BECAUSE MNMT HAS A SIX

8    PERCENT STATE, MNMT NECESSARILY BENEFITS FINANCIALLY FROM ROFS.

9          THAT'S NOT PROVEN.  IT COULD JUST BE THAT THE CHINESE

10   GOVERNMENT TAKES A STAKE IN ANY COMPANY THAT DOESN'T

11   NECESSARILY GENERATE A RETURN BUT TAKES A STAKE IF THEY GIVE

12   ANY SEED MONEY.  IT COULD BE THAT THEY WANTED A BOARD SEAT, IT

13   COULD BE ANY NUMBER OF THINGS.  WE DON'T KNOW.

14          THE COURT:  THOSE WOULD BE BENEFITS.

15          MR. GUGELMANN:  MAYBE, MAYBE.  BUT WE DON'T KNOW THAT

16   ANY OF THOSE EXISTS.  I'M SPECULATING AS MUCH AS THE GOVERNMENT

17   IS HERE.

18          THE FIRST PERSON TO TELL US THAT WAS DR. MULVENON, AND HE

19   DIDN'T TELL US THAT.  SO WE JUST HAVE NO EVIDENCE TO MAKE THAT

20   CONNECTION BETWEEN ROFS AND ANY INSTRUMENTALITY OF THE CHINESE

21   GOVERNMENT IN TERMS OF THE TYPE OF BENEFITS THAT FLOW THROUGH

22   HERE, THE ALLEGED POSSESSION OF STOLEN TRADE SECRETS.

23          THE COURT:  OKAY.  THANK YOU.

24          MS. KANE:  THANK YOU, YOUR HONOR.

25          I WOULD JUST NOTE THAT IN THEIR DISCUSSIONS OF HOW TO

1    STRUCTURE ROFS, ONE OF THE IDEAS THAT CAME UP, AND THIS CAME

2    DIRECTLY OUT OF A MEETING BETWEEN WEI PANG AND VICE PRESIDENT

3    HAO OF TJU, WAS THAT THEY SHOULD BE GIVING SHARES IN ROFS TO

4    CERTAIN PEOPLE WHO THEY WOULD NEED.  BECAUSE THOSE PEOPLE WERE

5    IMPORTANT FOR THEIR WORK IN THE UNIVERSITY AND THEY HAD TO RELY

6    ON THEM TO DEAL WITH OTHER OFFICIALS.

7          SO THAT IS AN UNDERSTANDING THAT ROFS WAS A BUSINESS, AND

8    THAT SHARES IN THAT BUSINESS WOULD BE SOMETHING OF VALUE.

9               THE COURT:  OKAY.

10              MS. KANE:  SO THAT'S IN THEIR VERY OWN WORDS.

11              THE COURT:  OKAY.

12         ALL RIGHT.  GREAT.  THANK YOU VERY MUCH.  THANKS FOR YOUR

13   HELP THIS MORNING AND IN YOUR BRIEFINGS.  THE MATTER IS UNDER

14   SUBMISSION.

15         OUR DATE AGAIN, MS. KRATZMANN?

16              THE CLERK:  THAT IS FEBRUARY 27TH AT 2:00 P.M., A

17    SPECIAL SET ON THURSDAY.

18              THE COURT:  OKAY.

19              MR. GUGELMANN:  THANK YOU.

20              THE COURT:  GREAT.  HAPPY HOLIDAYS TO ALL OF YOU.

21    SEE YOU THEN.

22              MS. KANE:  HAPPY HOLIDAYS TO ALL OF YOU AS WELL.

23         (THE PROCEEDINGS WERE CONCLUDED AT 12:14 P.M.)

24

25

1

2

3

4                          **CERTIFICATE OF REPORTER**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9     REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12    CERTIFY:

13              THAT THE FOREGOING TRANSCRIPT,

14    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15    CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16    SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18    TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24    _____
      SUMMER A. FISHER, CSR, CRR
25    CERTIFICATE NUMBER 13185            DATED: 12/18/19